**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| [Under Seal]<br><br>                    Plaintiffs,<br><br>          v.<br><br>[Under Seal]<br><br>                    Defendants. | **CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED**<br><br><br>**<u>FILED UNDER SEAL</u>** |

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MARYLAND, THE COMMONWEALTH  OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW JERSEY, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH  OF VIRGINIA, THE STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA, *ex rel*. RAVI SRIVASTAVA  Plaintiffs,  v.  TRIDENT USA HEALTH SERVICES LLC, SYMPHONY DIAGNOSTIC SERVICES NO. 1, INC. dba MOBILEXUSA, AUDAX GROUP, ADAM ABRAMSON, FRAZIER HEATHCARE PARTNERS, ALAN FRAZIER, NEW TRIDENT HOLDCORP, INC. AND TRIDENT HOLDING COMPANY, LLC  Defendants. | **RELATOR'S AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.* AND PENDENT STATE FALSE CLAIMS ACTS**  **CIVIL ACTION NO.  16-2956 (<u>SEALED</u>)**  **JURY TRIAL DEMANDED**  **FILED UNDER SEAL** |

<u>**AMENDED COMPLAINT**</u>

## TABLE OF CONTENTS

I.     SUMMARY OF THE CASE ................................................................ 2

II.    THE PARTIES ................................................................................... 7

III.   JURISDICTION AND VENUE ........................................................ 11

IV.    THE MEDICARE AND MEDICAID PROGRAMS ........................ 11

    A.     Medicare Part A ...................................................................... 11

    B.     The Medicaid Program ........................................................... 13

    C.     Medicare Part B ...................................................................... 14

V.     THE APPLICABLE LAW ............................................................... 16

    A.     The Federal False Claims Act ................................................. 16

    B.     The Federal Anti-Kickback Statute ........................................ 17

    C.     Applicable Government Program Guidance and Advisory Opinions .................. 19

    D.     Violations of the Anti-Kickback Statute Form the Basis of FCA Liability .......... 24

VI.    THE KICKBACK SCHEME ............................................................ 26

    A.     Introduction: Defendants Provide Below Cost Pricing to Nursing Homes on Medicare Part A Business to Induce Them to Refer Government Payor Business ........................................................ 26

    B.     Defendants Charge Nursing Homes that Can Refer Part B Business a Discounted Rate for X-rays on Part A Patients that is Below Defendants' Costs and/or is Commercially Unreasonable ........................................................ 30

        1.     Defendants' Total Average Variable Cost ("Cost") Per X-Ray Patient Encounter Is Approximately $73 ........................................................ 30

        2.     Defendants Charge SNFs Below Cost Prices For Mobile X-Rays ............. 36

    C.     Defendants Charge SNFs for X-rays on Medicare Part A Patients Much Less Than They Charge the Government for X-rays on Medicare Part B Patients ...... 43

    D.     Defendants Charge Facilities That Do Not Have Medicare Part B Business to Refer Much More Per X-ray Than Those That Do Have Part B Business to Refer ........................................................ 44

        1.     Defendants Charge Hospices, Which Have No Part B Business, More than SNFs, Which Do. ........................................................ 45

        2.     Defendants Charge Facilities that are Entirely Responsible for All Mobile Imaging Costs ("FACs"), Which Have No Part B Business to Refer, More than SNFs, Which Do. ........................................................ 47

    E.     Defendants Knowingly Provided Steep, Commercially Unreasonable and or Below Cost Discounts on Medicare Part A Business to SNFs ............................................................. 49

        1.     Trident Operated in a Highly Competetive Industry that Forced it to Match or Beat Competitors' Low Part A Pricing to SNFs ...................................... 49

2.   Trident's Financial Reporting was Designed to Hide its Low Part A Pricing, and thus the Swapping Scheme, From Everyone Except Its 6 Top Executives ................................................................. 61

a.   X-ray Variable Costs and Separate Part A Financial Metrics  Were Specifically Not Reported at Quarterly Business Reviews.................... 61

b.   X-ray Variable Costs and Separate Part A Financial Metrics Were Specifically Not Reported at Operations Review Meetings ................. 67

c.   X-ray Variable Costs and Separate Part A Financial Metrics  Were Specifically Not Reported at Senior Leadership Meetings.................... 68

d.   Trident's 6 Top Executives Knew of the Company's X-ray Variable Costs and the Low Part A Pricing, and thus the Swapping Scheme......... 73

3.   Trident Kept the Swapping Scheme Hidden From Potential Investors ....... 76

4.   Trident's Owners Knew of the Swapping Scheme ...................................... 79

VII.   FALSE CLAIMS ................................................................................................... 85

VIII.   DAMAGES ............................................................................................................ 86

IX.   COUNTS................................................................................................................ 87

REQUESTS FOR RELIEF ............................................................................................. 102

Plaintiff Ravi Srivastava, on behalf of the United States, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of New Jersey, the State of New Hampshire, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Wisconsin and the District of Columbia (collectively "the States" or "the Plaintiff States"), brings this action for violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False Claims Act" or "FCA"), as well as for violations of the following state false claims acts: The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act of 2010, Md. Code Ann. § 2-602 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; The Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; The New Hampshire False Claims Act, RSA tit. XII, Ch. 167: 61-b; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid

Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against

Taxpayers Act, Va. Code §§8.01-216.1 *et seq.* and the Wisconsin False Claims for Medical

Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to collectively as the "State False Claims

Acts" or "State FCA's"),  to recover all damages, civil penalties and all other recoveries provided

for under the Federal False Claims Act and the State False Claims Acts.

## I.    SUMMARY OF THE CASE

1.      Defendants sell mobile X-rays services which are commonly used by skilled

nursing facilities ("SNFs") and other institutions, like assisted living facilities and entities

providing hospice care.  SNFs are the largest source of customers and revenues for Defendants'

mobile X-ray services.  SNFs represent more than 90% of the mobile X-ray services sold by

Defendants.  SNFs are responsible for payment of the mobile X-ray services for Medicare Part A

patients.  This case involves a swapping scheme whereby Defendants sold their mobile X-ray

services at a loss or at steeply discounted commercially unreasonable prices to SNFs and other

entities in connection with their Medicare Part A patients in exchange for referrals of profitable

government business in connection with their Medicare Part B and Medicaid patients where the

government reimbursed Defendants.  Defendants charged different prices for the same X-ray

services which had the same exact variable costs depending on whether the services were for

Medicare Part A patients that SNFs had to pay for compared to Medicare Part B and Medicaid

patients which the government paid for.

2.      The most senior executives of the Company knew of the scheme and all of the

financial metrics that made the scheme work, and ensured, through obfuscating the Company's

financial reporting, that other employees or even potential investors in the Company could not

know of the scheme. Relator, a top executive involved in designing financial reporting

mechanisms, but not among the most senior executives, suspected the scheme because the

Company disabled him from reporting certain routine and logical financial metrics that, as he came to learn later, would have exposed the scheme. It was not until after Relator was terminated for complaining of a different activity that he was able to piece together the data he had previously been prevented from compiling and uncover the illegal kickback scheme.

3.  Nursing homes, a/k/a "skilled nursing facilities" or "SNFs," provide nursing care to their patients.  To do so, nursing homes need reliable service providers, including for mobile imaging services.  Defendants in this matter are parent and subsidiary corporate entities that provide such on-site, mobile imaging services (including X-ray and Ultrasound) pursuant to contracts with nursing homes.

4.  Due to the administrative and practical complexities involved in providing services to nursing home patients, nursing homes nearly always select a single company to provide imaging services such as X-rays to all of that nursing home's residents, regardless of each patient's type of insurance (*e.g*., Medicaid, Medicare Part A, Medicare Part B, or private insurance). This is known as the "single source" business model.

5.  In the latter part of 1998, Medicare changed its payment methodology with respect to Medicare Part A patients in nursing homes.  Instead of nursing homes "passing through" the cost of patient services to Medicare, Medicare began paying a fixed sum per patient per day to nursing homes for all services needed in the care of nursing home patients, including the cost of X-rays.  This made nursing homes financially responsible for all of their costs and placed nursing home owners at financial risk for the costs of X-rays and other services, such as drugs, provided to those Medicare Part A patients.

6.      Reimbursement for services that are covered under Part B and Medicaid[1] did not change, meaning that service providers (like Defendants here) continued to bill Medicare and Medicaid directly and receive whatever reimbursement Medicare and Medicaid permitted.

7.      The shift to a "per diem" reimbursement methodology for SNFs for Medicare Part A patients created perverse incentives in terms of how service providers such as the Defendants negotiated billing arrangements with those facilities, who gave the entirety of their business to the provider under the "single source" business model.  Essentially, the key cost component for the SNFs was the amount they would have to pay out-of-pocket to service providers for Part A patients because the SNFs were entirely at risk for all of those costs.  On the flip side, the service provider was focused on having the opportunity to provide services to Part B and Medicaid patients, for which the service provider was directly reimbursed by the government.  Knowing that the SNFs' primary focus was to obtain the lowest price possible on the costs it had to pay for their Part A patients, and given the high volume and fee for services that a service provider could bill under Part B and Medicaid, those providers negotiated very low rates with the SNFs for the SNFs' Part A business to secure its Part B and Medicaid business.

8.      Indeed, because Defendants operate in a highly competitive environment, they use commercially unreasonable and/or below Cost pricing on Part A business as a loss leader to attract new clients and to retain their existing clients. Defendants still profited, however, because a SNF's higher priced and profitable Government Payor business more than made up for its low priced and unprofitable Part A business.

9.      More specifically, Defendants exploited the SNF's financial risk under Part A by offering them prices for X-rays given to the nursing homes' Part A patients that are (i) below its

---

[1] Historically and by statute, the standard delivery system for Medicaid is fee for service but states are increasingly moving to the use of managed care and other integrated care models. https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/delivery-systems.html

own actual variable costs necessary to operate the mobile X-ray business without including any fixed costs ("Costs"), (ii) commercially unreasonable, and/or (iii) well below fair market value, *in exchange for* the opportunity to provide X-rays to the nursing homes' Medicare Part B and Medicaid ("Government Payor") patients, for which the government directly pays Defendants a fee for each X-ray service provided at a much higher rate. The nursing homes have agreed.

10.     Stated differently, to compensate for the profit Defendants were losing when they charged nursing homes below Cost prices for X-rays for the nursing homes' Medicare Part A patients, the Defendants obtained the profitable, higher paying business paid for by Medicare Part B and Medicaid. Indeed, Defendants gave the below Cost and/or commercially unreasonable prices to those SNFs that had Part B or Medicaid business to refer. Thus, Defendants used the profitable, taxpayer-funded Government Payor programs to subsidize the steep discounts Defendants gave to SNFs for their Medicare Part A business. These steep discounts - otherwise known as kickbacks - brought the Part A X-ray prices down to levels that were below Defendants' own actual variable costs necessary to operate the mobile X-ray business, without including any of the generalized fixed costs attributable to that business.

11.     In fact, Defendants charged those types of facilities that did not have Government Payor business to refer (such as hospices and psychiatric facilities) up to five times more per X-ray per patient ("per X-ray") than they charged those facilities that do have Government Payor business to refer (such as - SNFs and some Assisted Living Facilities (ALFs)).

12.     Further, the price per Part A X-ray that Defendants charged SNFs and ALFs with Government Payor business to refer was dramatically below the price Defendants charged the government for each X-ray administered to a Government Payor patient, which Relator calculates to be $316 per X-ray (*see* ¶48), and much lower than the $140 that Medicare Part B actually reimbursed Defendants for mobile X-ray services.

5

13.     Because SNFs used only one provider to furnish mobile X-ray services, Defendants' goal was always to induce nursing homes with steep discounts in the Part A business to give Defendants their higher-paying Government Payor business.   Indeed, it was well understood by Trident management and sales personnel that once Trident secured a SNF as a client, Trident would receive all of that SNF's mobile imaging business, including Part A and the more lucrative Government Payor business.

14.     This swapping/kickback arrangement has been specifically addressed in a host of government program guidance and advisory opinions.   These authorities uniformly hold that swapping implicates the Anti-Kickback Statute ("AKS"), and is not protected by the "discount safe harbor."[2]

15.     Trident kept this swapping scheme well hidden from all but a few top-level executives.  Trident's internal financial reporting never reported the true variable cost per X-ray per patient and never broke out Part A revenues, costs and number of patients separately from Part B and Medicaid. In addition, Trident's top-level executives also kept Trident's National and Regional Chain Pricing List, which detailed the Part A prices Trident charged each facility, closely guarded among themselves.   As such, no other employee or anyone else could ever compute or discover that Trident's Part A pricing was below its variable costs. In fact, several private equity firms aiming to invest in or acquire Trident specifically requested, as part of their due diligence, Part A financial metrics separated out from Part B. Defendants did not provide the requested financial information about the Part A services.   The potential investors walked away from any deal with Trident.

---

[2] For further information, see Section V(C), below.

16.    The continued and intentional blending of Trident's Part A and Part B financial reporting, which kept the swapping scheme hidden, was directed from the top. Indeed, on several occasions, CFO John Lanier specifically dissuaded Relator, as Trident's Chief Information Officer responsible for financial reporting systems and building Trident's data warehouse, from building a system that would accurately report Part A financial metrics separately from Part B.

17.    While keeping everyone else in the dark, Trident's six top level executives, including its CEO, CFO, Presidents, General Counsel and Executive Vice President of Sales, knew Trident's actual variable cost per X-ray and all of its Part A pricing such that they were fully aware that Trident was extending below variable cost pricing on the Part A business in exchange for the more lucrative Part B and Medicaid business.

18.    By using the Government Payor Programs to subsidize kickbacks to nursing home owners in the form of below Cost or commercially unreasonable charges for X-rays for Medicare Part A patients, the Defendants profited handsomely at the expense of the Government Plaintiffs. The amount of money flowing from the government to the Defendants is a large and vital part of Defendants' business. Medicare Parts A and B and Medicaid account for approximately 85% of MobilexUSA's X-ray revenues ($140 million) annually, making facilities that offer both Part A and Part B business vital clients for the company. Every dollar of government money that was subject to the kickback scheme is recoverable through this lawsuit.[3]

## II.    **THE PARTIES**

19.    Defendant Trident USA Health Services, Inc. ("Trident") is a Delaware limited liability corporation established in 2008 with its headquarters at 930 Ridgebrook Road, Sparks

---

[3] *See* 42 U.S.C. § 1320(a)-7b(g)(clarifying the AKS to expressly state that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  Prior to this clarification, courts have held that any government payments made for services tainted by illegal referrals are recoverable as damages under the FCA.  *See, e.g., United States v. Rogan*, 459 F.Supp.2d 692, 726-727 (N.D. Ill. 2006), *affirmed* 517 F.3d 449 (7th Cir. 2008).

Glencoe, MD 21152.  Trident is the leading national provider of bedside diagnostics, laboratory services and hospice care in the United States. Trident provides services to more than 12,000 post-acute facilities across 43 states and does business with over 7,000 skilled nursing facilities (SNFs) throughout the country, providing services to 1.5 million beds nationwide. Trident is the parent company of the following subsidiaries:

- Symphony Diagnostic Services No. 1, Inc. dba MobilexUSA, the nation's leading provider of bedside mobile imaging services;

- Diagnostic Laboratories and Radiology, which offers a comprehensive range of laboratory, radiology, ultrasound and EKG services to skilled nursing facilities, healthcare facilities, physicians and correctional markets in the western United States;

- U.S. Laboratories, which provides mobile phlebotomy, laboratory testing and radiology services to more than 200 facilities and physician practices throughout Massachusetts and Rhode Island;

- TridentUSA Mobile Clinical Services and its affiliates, which have been providing comprehensive Vision Care, Foot Care and In-House Staff Practitioner medical care services to over 1.5 million residents of Skilled Nursing and Assisted Living facilities throughout the United States for over 15 years; and

- Rely Radiology®, which provides more than 1.4 million x-ray and ultrasound interpretations each year, transmitting data using digital, computer-assisted technologies. It is currently licensed in 48 states and serves over 7,000 customers nationwide including imaging centers, radiology groups, mobile x-ray providers, skilled nursing facilities, hospice, home health providers, correctional facilities, physician offices and assisted living centers.

20.     Defendant Symphony Diagnostic Services No. 1, Inc. dba MobilexUSA, Inc. ("MobilexUSA ") is a subsidiary of Trident and is the nation's leading provider of bedside mobile imaging services. It is headquartered at 101 Rock Road, Horsham, PA 19044. The company provides services directly to individual patients through more than 7,000 healthcare-providing organizations including nursing homes, rehabilitation hospitals, home care and hospice agencies, correctional markets, occupational medicine and professional sports franchises throughout most of the United States, including the states not covered by Trident's Diagnostic Laboratories and

Radiology subsidiary, which provides services in the western United States. MobilexUSA, with gross revenue of approximately $250 million per year, maintains the following regional offices:

- MobilexUSA Corporate Office
  located at 930 Ridgebrook Road 3rd Floor, Sparks Glencoe, MD 21152-9390

- MobilexUSA Mid Atlantic Regional Office
  located at 101 Rock Road, Horsham, PA 19044

- MobilexUSA Mid-West Regional Office
  located at 6185 Huntley Road, Ste Q, Columbus, OH 43229

- MobilexUSA Gulf Regional Office
  located at 13773 Icot Blvd., Suite 502, Clearwater, FL 33760

21.     Defendant New Trident Holdcorp, Inc. ("New Trident Holdcorp") is the parent corporation of Trident, and has been since July 2013. New Trident Holdcorp. is a 100% owned financing subsidiary of Defendant Trident Holding Company, LLC.  New Trident Holdcorp was formed in July of 2013 as part of the purchase agreement between the then owners/sellers of Trident and the buyers led by Formation Capital. New Trident Holdcorp is owned by: Formation Capital, which owns a majority stake; previous owners of Trident Defendants Audax Group and its principal Adam Abramson, and Frazier Healthcare and its principal Alan Frazier; and former Trident management.  Defendant Trident Holding Company, LLC is owned by private equity investing companies Formation Capital, Audax Group, and Revelstoke Capital Partners. Revelstoke Capital Partners joined in December of 2016 with the merger of Schryver Medical and Trident.

22.     Defendants Trident and MobilexUSA, Audax Group, Adam Abramson, Frazier Heathcare Partners, Alan Frazier, New Trident Holdcorp, Inc. and Trident Holding Company, LLC will be collectively referred to as the "Defendants."

9

23. The United States is a plaintiff to this action. The United States brings this action on behalf of the Department of Health and Human Services ("DHHS") and the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid Programs.

24. The States of Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Hampshire, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, and the District of Columbia are plaintiffs for whom recovery is sought for damages to their respective state Medicaid programs.

25. The United States and the States are collectively referred to as the "Government Plaintiffs."

26. Plaintiff Ravi Srivastava ("Relator") is a citizen of the United States and a resident of West Hartford, Connecticut. From November 2010 through July 2012, Relator served as the Chief Information Officer at Trident where he held end-to-end responsibility for all company technology platforms and oversaw Information Technology teams in each of the company's subsidiaries, including MobilexUSA. He was a member of Trident's Senior Leadership Team and led a team tasked with managing and maintaining Trident's billing and data systems. His employment was terminated after he internally reported regulatory compliance issues. Relator is currently the Vice President of Information Systems at a Fortune 500 company in Hartford, Connecticut. Relator holds an M.S. in Computer Information Systems from Arizona State University (1993) and an M.B.A. from Claremont University (2002).

27. Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1) and analogous provisions in the State False Claims Acts. Relator brings this action on behalf of the United States for violations of the Federal False Claims Act and on behalf of each Plaintiff State named herein for violations of its respective State False Claims Act.

10

28.    Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## III.    JURISDICTION AND VENUE

29.    Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 et *seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

30.    Venue in the Eastern District of Pennsylvania is appropriate under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that the Defendants transact or transacted business in the Eastern District of Pennsylvania.

## IV.    THE MEDICARE AND MEDICAID PROGRAMS

### A.    Medicare Part A

31.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, established the Medicare program. The United States, through DHHS, and its sub-agency, CMS, administers the Medicare Program.  Part A of the Medicare program ("Part A") covers inpatient services furnished to Medicare beneficiaries by participating providers, including hospitals and nursing homes. 42 U.S.C.S. § 1395d(a).

32.    Nursing homes, a/k/a "skilled nursing facilities" or "SNFs," are reimbursed under Part A.  A nursing home is an "institution (or distinct part of an institution) which is primarily engaged in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons." 42 U.S.C. § 1395i-3(a)(1). A nursing home may be freestanding, or it may be part of a hospital. *See* 42 U.S.C. § 1395yy(a) (discussing reimbursements for both hospital-based and freestanding SNFs).

11

33.     In order to participate in Medicare Part A, a nursing home must execute Form CMS-855A, the Medicare Enrollment Application for institutional providers. As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

34.     Under Medicare Part A, a nursing home provides "post-hospital extended care services for up to 100 days during any spell of illness." 42 U.S.C. § 1395d(a)(2). This includes, pursuant to 42 U.S.C. § 1395x(h)(7), "such other services necessary to the health of the patients as are generally provided by skilled nursing facilities, or by others under arrangements with them made by the facility." This includes X-rays.[4]

35.     Prior to July 1, 1998, Medicare Part A reimbursed nursing homes on an "actual cost" basis, *i.e.*, the service provider billed the nursing home for each service provided to each patient, which the nursing homes were responsible to pay. The nursing home later recouped those costs from Medicare through a cost-reporting process that permitted the nursing homes to "true up" to their actual costs. In other words, nursing homes "passed through" all costs for services provided to Part A patients to the federal government.

36.     Consequently, when making a choice regarding which service provider to use, nursing homes did not focus on cost. Instead, they chose the service provider based on the needs of their patients, and the quality of services provided by the service provider.

---

[4] The term "medical and other health services" means any of the following items or services: . . . (4) X-ray, radium, and radioactive isotope therapy, including materials and services of technicians; 42 U.S.C. § 1395x(s)(4).

37.     Effective July 1, 1998, Congress changed the reimbursement methodology for nursing home services covered under Part A to the prospective payment system ("PPS").  Under PPS, the government reimbursed nursing homes for Part A patients based on a flat, per day rate ("bundled rate" or "per diem").  42 U.S.C. § 1395yy(e).  Thus, after July 1, 1998, Medicare Part A began paying nursing homes a flat rate to provide all medical care to covered residents.

38.     Under this system, which remains in effect today, nursing homes no longer are reimbursed on an actual cost basis, and thus they can no longer pass-through costs of services such as X-rays and ultrasound to Medicare.  Instead, nursing homes are responsible to pay the service provider directly for the services provided – dollar-for-dollar.  They are reimbursed a flat rate by Medicare Part A regardless of the amount the nursing homes actually spend on services for its Part A patients.  Accordingly, under the PPS/bundled system, nursing homes are financially at risk for the services provided to Part A patients.  Thus, nursing homes are incentivized to bargain for the lowest available X-ray prices from the Defendants.

**B.     The Medicaid Program**

39.     Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 *et seq.* The federal portion of States' Medicaid payments, the Federal Medical Assistance Percentage, is based on a State's per capita income compared to the national average. The federal portion consisted of a minimum of 50% up to a maximum of roughly 80%. However, for 2014 through 2016, "the federal government will finance 100% of the costs for individuals newly eligible for Medicaid" under the Affordable Care Act. *See* The Henry J. Kaiser Family Foundation, *Medicaid and HIV/AIDS*, Mar. 2013.

40.     The law requires state Medicaid plans to execute written agreements between the

Medicaid agency and each provider furnishing services under the plan ("provider agreements").

42 C.F.R. § 431.107(b),

41.     Nursing homes and mobile imaging service providers, such as the Defendants, are "providers" who are required to sign provider agreements with each state Medicaid program with which they wish to conduct business.  Although there are variations in the agreements among the states, the agreements typically require the provider to agree that it will comply with all Medicaid requirements, as well as other federal and state laws, including any applicable Anti-Kickback provisions.  In a number of states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with Anti-Kickback laws.

42.      Among other things, the Medicaid programs of all states reimburse for imaging services. Many states award contracts to private companies to evaluate and to process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private contractors submit claims to the state Medicaid programs, which in turn obtain federal funds from the United States.

43.     Through this process, the Defendants supplied mobile imaging (X-ray) services to nursing home patients and presented, or caused to be presented, reimbursement claims to state Medicaid programs, their contractors, and the federal government.

## C.     Medicare Part B

44.     The Medicare program is administered by the Department of Health and Human Services through the Centers for Medicare & Medicaid Services, or CMS. Medicare Part B is a federally subsidized medical insurance program that pays a portion of the insured's medical expenses. The United States reimburses the medical expenses through the CMS, which, in turn, contracts with private insurance companies to administer and pay claims from the Medicare Trust

Fund.

45.     Medical services and supplies covered by Medicare Part B include (but may not be limited to):

- Doctor's visits
- Laboratory tests and X-rays and imaging services
- Emergency ambulance services
- Mental health services
- Durable medical equipment
- Preventive services, such as pap tests, flu shots, and screenings
- Rehabilitative services, including physical therapy, occupational therapy, and speech-language pathology services

46.     Companies like Defendants that provide SNFs with imaging services to Medicare Part A beneficiaries, bill the SNFs for those services.  The SNF is responsible to pay the provider, such as Trident, for the services provided to Part A patients out of its own pockets.  Under Part A, the SNF is responsible for all of its own costs, regardless of how much or how little of those costs is covered by the per diem amount the SNF receives from the government for Part A patients. If the SNF's total costs for services provided are greater than the total per diem amount the SNF received from the government, the SNF will be operating at a loss. Thus, there is great financial incentive for the SNF to keep its costs for services on Part A patients as low as possible to reduce or eliminate this loss or conversely to increase its profits.

47.     In contrast, under Part B and Medicaid, the SNF is not at all responsible for charges for imaging and other services because the service provider bills the government directly for those services and is paid by the government on a *per service basis*, also known as a "fee for service" ("FSS") model.  If the SNF inpatient has Part B coverage, but is ineligible for Part A or has exhausted his or her benefits under Part A, the costs of radiology services are covered under Part B which is government reimbursed.

48.     Companies are required by statute to charge the Government their usual and

15

customary rates for each X-ray or other imaging service. In practice, however, companies such as Defendants simply charge the Government a rate that ensures the Government will pay the maximum amount possible. Relator calculates that Defendants charge the Government approximately $316 per X-ray, although the government reimburses Defendants less.

49.     Because Medicare Part B and Medicaid provide payment for services directly to the service provider, SNFs might demand—or a service provider like Defendants might offer— discounts with respect to Part A business in exchange for a commitment by the SNF to use the service provider for items or services reimbursed at the higher reimbursement rates paid by Medicare Part B and Medicaid. That is what happened here. Defendants offered SNFs that could refer Part B or Medicaid business below Cost or commercially unreasonable prices for their mobile X-ray business for Medicare Part A patients in exchange for more profitable government paid business.

## V.     THE APPLICABLE LAW

### A.     The Federal False Claims Act

50.     The Federal False Claims Act provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

> * * *

> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

51.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### B.     The Federal Anti-Kickback Statute

52.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

53.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

> whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S .C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.

42 U.S.C.§1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).  Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

54.     The Anti-Kickback Statute and the corresponding regulations establish a number of ''safe harbors'' for common business arrangements. The safe harbors protect arrangements from creating liability under the statute.   An arrangement must fit squarely in a safe harbor to be protected. Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation.   Once the plaintiff proves that the Anti-Kickback Statue applies, the burden shifts to the defendant to prove that its conduct fits within one of the exceptions.

55.     The "discount" safe harbor is discussed at 42 C.F.R. §1001.952(h)(5) as follows:

[T]he term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction. The term discount does not include --

(ii) *Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service*, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology;

(iii) *A reduction in price applicable to one payer but not to Medicare, Medicaid or other Federal health care programs.*

18

42 C.F.R. §1001.952(h)(5)(emphasis added).

### C.    Applicable Government Program Guidance and Advisory Opinions

56.    Swapping has been directly addressed in various statutes, regulations, program guidance, and advisory opinions for more than 20 years.  The authorities, without exception, hold that swapping violates the AKS.

57.    On July 29, 1991, in the preamble to the "discount" safe harbor, the OIG illustrated the problems with "swapping" and discussed the reasons why swapping is not protected by the discount safe harbor:

> [W]e are aware of cases where laboratories offer a discount to physicians . . . but do not offer the same discount to the Medicare program.  In some of these cases, the discount offered to the physician is explicitly conditioned on the physician's referral of all of his or her laboratory business.  Such a "discount" does not benefit Medicare, and is therefore inconsistent with the statutory intent for discounts . . . .

56 Fed. Reg. 35977.

58.     Four years later, in December, 1994, the OIG warned in a Special Fraud Alert of the risks of such practices:

> The Medicare program pays for laboratory tests provided to patients with end stage renal disease (ESRD) in two different ways. Some laboratory testing is considered routine and payment is included in the composite rate paid by Medicare to the ESRD facility which in turn pays the laboratory. Some laboratory testing required by the patient is not included in the composite rate, and these additional tests are billed by the laboratory directly to Medicare and paid at the usual laboratory fee schedule price.
>
> The OIG is aware of cases where a laboratory offers to perform the tests encompassed by the composite rate **at a price below fair market value** of the tests performed. In order to offset the low charges on the composite rate tests, the ESRD facility agrees to refer all or most of its non-composite rate tests to the laboratory. This arrangement appears to be an offer of something of value (composite rate tests **below fair market value**) in return for the ordering of additional tests which are billed directly to the Medicare program.

> If offered or accepted in return for referral of additional business, the lab's pricing scheme is illegal remuneration under the anti-kickback statute. The statutory exception and "safe harbor" for "discounts" does not apply to immunize parties to this type of transaction, since discounts on the composite rate tests are offered to induce referral of other tests. See 42 C.F.R. §1001.952(h)(3)(ii).

OIG Special Fraud Alert (December 19, 1994) (emphasis added)

59.     Five years later, in 1999, the OIG commented more on such arrangements as follows:

> [s]uch price reductions create a risk that a supplier may be offering remuneration in the form of discounts on business for which the purchaser pays the supplier, in exchange for the opportunity to service and bill for higher paying Federal health care program business reimbursed directly by the program to the supplier.  In such circumstances, neither Medicare nor Medicaid benefits from the discount; to the contrary, Medicare and Medicaid may, in effect, subsidize the other payer's discounted rates.[5]  . . . Accordingly, **the discount safe harbor specifically excludes "a reduction in price applicable to one payor but not to Medicare or a State health program."**  See 42 CFR §1001.952(h)(3)(iii).

OIG Advisory Opinion 99-2 (March 4, 1999), at pg. 5 (emphasis added).

60.     The arrangement in question in OIG Advisory Opinion 99-2 involved ambulance companies providing nursing homes with steep discounts for transporting Medicare Part A patients, in exchange for the opportunity to provide ambulance services to nursing home patients covered by Medicare Part B and other federal programs under which the nursing home was not responsible for transportation costs.  After concluding that the discount safe harbor was not applicable, the OIG provided the following analysis regarding the kickback implications of such an arrangement:

> The circumstances surrounding the arrangement suggest that a nexus may exist between the discount to the SNFs for PPS-covered transports and

---

[5] "This is particularly problematic when the contracting payer is a PPS SNF, because Medicare Part B payments essentially may subsidize Part A PPS payments that the government has determined are appropriate and adequate to cover the SNF's costs" (footnote and quote in original).

referrals of other Federal health care program business.[6]  First, the SNFs are in a position to direct a significant amount of business to [the ambulance company] that is not covered under the PPS payment.  Second, both parties have obvious motives for agreeing to trade discounts on PPS business for referrals of non-PPS business: the SNFs to minimize risk of losses under the PPS system and [the ambulance company] to secure business in a highly competitive market.  Third, [the ambulance company's] request for an advisory opinion comes amidst a considerable number of informal inquiries and anecdotal reports regarding discounts to SNFs that this Office has received since enactment of SNF PPS [on July 1, 1998].  These inquiries and reports suggest that suppliers of a wide range of SNF services are giving SNFs discounts for PPS-business that are linked, directly or indirectly, to referrals of Part B business.

OIG Advisory Opinion 99-2 (March 4, 1999), at pgs. 5-6 [bracketing added].

61.    OIG Advisory Opinion 99-2 goes on to provide additional insight regarding other,

similar improper business arrangements:

In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, we look for indicia that the discount is not commercially reasonable in the absence of other, non-discounted business.  In this regard, discounts on SNF PPS business that are particularly suspect include, but are not limited to:

- **discounted prices that are below the supplier's cost**, and
- **discounted prices that are lower than the prices that the supplier offers to a buyer that** (i) generates a volume of business for the supplier that is the same or greater than the volume of Part A business generated by the PPS SNF, but (ii) **does not have any potentially available Part B or other Federal health care program business**. (bold emphasis added)

This is an illustrative, not exhaustive, list of suspect discounts; other arrangements may be equally suspect.  Each of the above pricing arrangements independently gives rise to an inference that the supplier and the SNF may be "swapping" discounts on Part A business in exchange for profitable non-discounted Part B business, from which the supplier can recoup losses incurred on the discounted business . . . .  In connection with items or services provided to PPS SNFs, the presence of **either** of these discount arrangements is particularly suspect under the anti-kickback statute.  Other indicators of suspect discounts include (i) discounts on PPS-

---

[6] "We note that the Agreement contains statements to the effect that remuneration provided under the Agreement is not intended to induce referrals of other business.  We find these statements self-serving and not persuasive" (footnote and quote in original).

covered business that are coupled with exclusive supplier agreements and
(ii) discounts on Medicare PPS or other capitated or prospective program
business made in conjunction with explicit or implicit agreements to refer
other facility business to the supplier, including Part B or other Federal
health care program business.

OIG Advisory Opinion 99-2 (March 4, 1999), at pg. 6 (emphasis in original).

62.     In response to a request for clarification of the 99-2 Opinion, the OIG expanded

upon the 99-2 Opinion in a letter that same year. The letter reiterated that the arrangements

proposed in the 99-2 Opinion "fell squarely within the anti-kickback statute" and that the possible

incentives were "the very evils that the anti-kickback statute is designed to prevent." The OIG

further explained that **it looks for whether the discount makes business sense "standing alone,"**

confirming its stance that "any direct or indirect link" between the discount and referrals would

implicate the AKS. Discount Arrangements Between Clinical Laboratories and SNFs (Sept. 22,

1999), available at http://oig.hhs.gov/fraud/docs/safeharborregulations/ rs.htm.

63.     In March 2000, the OIG issued a formal Program Guidance which discussed risk

areas for nursing homes under the Anti-Kickback Statute.  Citing OIG Advisory Opinion 99-2,

swapping was specifically identified as a problem, and was defined as follows:

> **"Swapping" occurs when a supplier gives a nursing facility discounts
> on Medicare Part A items and services in return for the referrals of
> Medicare Part B business.**  With swapping, there is a risk that suppliers
> may offer a SNF an excessively low price for items or services reimbursed
> under PPS in return for the ability to service and bill nursing facility
> residents with Part B coverage.  *See* OIG Advisory Opinion 99-2 (February
> 1999).

OIG Program Guidance for Nursing Facilities.  65 Fed. Reg. 14289 (March 16, 2000)(Ftn. 75)
(bold emphasis added).

64.     Although the Anti-kickback Statute, particularly when combined with the

authorities cited immediately above, prohibits the conduct at issue in this complaint, that

conclusion was effectively codified on September 30, 2008, when the OIG issued an additional

Program Guidance regarding "swapping" in the Medicare Part A nursing home context:

> Nursing facilities often obtain discounts from suppliers and providers on items and services that the nursing facilities purchase for their own account. In negotiating arrangements with suppliers and providers, a nursing facility should be careful that there is no link or connection, explicit or implicit, between discounts offered or solicited for business that the nursing facility pays for and the nursing facility's referral of business billable by the supplier or provider directly to Medicare or another Federal health care program. ***For example, nursing facilities should not engage in "swapping" arrangements by accepting a low price from a supplier or provider on an item or service covered by the nursing facility's Part A per diem payment in exchange for the nursing facility referring to the supplier or provider other Federal health care program business, such as Part B business excluded from consolidated billing, that the supplier or provider can bill directly to a Federal health care program. Such "swapping" arrangements implicate the anti-kickback statute and are not protected by the discount safe harbor.***
>
> As we have previously explained in other guidance, the size of a discount is not determinative of an anti-kickback statute violation. Rather, the appropriate question to ask is ***whether the discount is tied or linked, directly or indirectly, to referrals of other Federal health care program business.*** When evaluating whether an improper connection exists between a discount offered to a nursing facility and referrals of Federal health care program business billed by a supplier or provider, suspect arrangements include **below Cost arrangements or arrangements at prices lower than the prices offered by the supplier or provider to other customers with similar volumes of business, but without Federal health care program referrals**. Other suspect practices include, but are not limited to, discounts that are coupled with exclusive provider agreements and discounts or other pricing schemes made in conjunction with explicit or implicit agreements to refer other facility business. ***In sum, if any direct or indirect link exists between a price offered by a supplier or provider to a nursing facility for items or services that the nursing facility pays for out-of-pocket and referrals of Federal business for which the supplier or provider can bill a Federal health care program, the anti-kickback statute is implicated.***

OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (emphasis added).

65.     Several more OIG Advisory Opinions followed, echoing the same or similar language.[7] Through these statements, the OIG has established the following four maxims regarding swapping arrangements:

- "**Any link or connection**, whether explicit or implicit, **between the price offered for business paid out of the purchaser's pocket and referrals of Federal program business billable by the…supplier will implicate the anti-kickback statute**."[8]

- "The size of the discount is not determinative…the appropriate question to ask is **whether the discount is tied or linked, directly or indirectly, to referrals** of other Federal healthcare program business."[9]

- Although "any link" may implicate the AKS, in order to determine if there should be an inference of an "improper nexus" between discounts and referrals, the government will "look for **indicia that the discounted rate is not commercially reasonable in absence of other, non-discounted business**."[10]

- While the AKS contains a specific statutory exception for discounts and a **regulatory safe harbor was established**, these so-called swapping arrangements are illegal remuneration that do not fall within either because those **protections were meant solely for arrangements that benefit Medicare or Medicaid**.[11]

### D.      Violations of the Anti-Kickback Statute Form the Basis of FCA Liability

66.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d Cir. 1985).

---

[7] OIG Advisory Opinion No. 11-11 (Aug. 04, 2011), available at https://oig. hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-11.pdf; OIG Advisory Opinion No. 12-09 (July 30, 2012), available at https://oig.hhs.gov/fraud/ docs/advisoryopinions/2012/AdvOpn12-09.pdf.

[8] OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed. Reg. 14245, 14252 (Mar. 24, 2003).

[9] OIG Advisory Opinion No. 99-13 (December 07, 1999), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/1999/ao99_13.htm.

[10] OIG Advisory Opinion No. 12-09 (July 30, 2012), available at https://oig.hhs. gov/fraud/docs/ advisoryopinions/2012/AdvOpn12-09.pdf; OIG Advisory Opinion No. 11-11 (Aug. 04, 2011), available at https://oig.hhs.gov/fraud/ docs/advisoryopinions/2011/AdvOpn11-11.pdf; AML Discount Letter (Apr. 20, 2000), available at https://oig.hhs.gov/fraud/docs/safeharborregulations/amldiscount.htm.

[11] 42 U.S.C. § 1320a-7b(b)(3)(A) (stating that "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program."); 42 C.F.R. § 1001.952(h)(5)(iii); OIG Advisory Opinion No. 99-2 (Mar. 04, 1999), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/1999/ao99_2.htm.

Because kickback schemes negatively affect the integrity of federal health care programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.,* (3d Cir. Oct. 2010) (No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant) ("Amicus Brief").

67.     To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare program. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.,* 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies,* 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan,* 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

68.     These and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes. Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[12]

---

[12] *See, e.g., United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.,* 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp*., 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig*., 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc*., 234 F.R.D. 113, 121 (W.D. Pa. 2001).

69.     Moreover, the AKS was recently amended to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).

70.     Finally, in February, 2012, in a case against Defendant MobilexUSA, a federal court for the first time directly addressed whether swapping in the nursing home context can form the basis for liability under the FCA.  *See United States ex rel. McDonough v. Symphony Diagnostic Services, Inc. et al.*, 2012 U.S. Dist. LEXIS 48026 (S.D. Ohio 2012).  In denying the defendant's motion to dismiss, the *McDonough* court held that the defendant's "agreements with [nursing homes] to provide free or heavily discounted, below market X-ray services under Medicare Part A in exchange for exclusive referrals for the [nursing homes'] Medicare Part B services states a claim for relief from violations of the Anti-Kickback statute and the FCA."  *Id.* at 23-24.  The same swapping arrangement is present in the instant case which is against the same defendant.  Here, however, only variable costs attributable to providing the X-ray services are included to show that Defendants' prices to SNFs for X-ray services under Medicare Part A were heavily discounted, below cost or commercially unreasonable. No fixed costs are included, as they were in *McDonough,* which was ultimately dismissed on summary judgment.

## VI.     THE KICKBACK SCHEME

### A.     Introduction: Defendants Provide Below Cost Pricing to Nursing Homes on Medicare Part A Business to Induce Them to Refer Government Payor Business

71.     Defendants provide SNFs and other facilities (including Assisted Living Facilities and prisons) with mobile imaging services, i.e. portable X-rays and ultrasounds. This means that Defendants deploy a technician to travel to the facility with the proper mobile imaging equipment, take the prescribed image (X-ray or ultrasound) of the patient bedside, and then transmit these images electronically to Trident. Defendants then provide these images to a radiologist, who

26

interprets the images and writes a diagnostic report containing the results of the imaging studies. Defendants then send the report via facsimile to the prescribing physician or nurse practitioner at the facility.

72.    If the inpatient at the SNF is covered under Medicare Part A, Defendants will bill the SNF for those imaging services.  The SNF is responsible to pay that bill directly to Defendants. While the SNF receives per diem payments from the Government for Part A patients, the SNF has every incentive to pay the lowest rates possible for all of the services it provides to its inpatients covered under Part A so as to maximize its profits or minimize its losses. This incentive is well known to the service providers, such as Defendants, who compete in the marketplace to provide the lowest cost to the SNF for their services in order to secure all of the business of the SNF or ALF. Generally, SNFs used only one provider to furnish mobile X-ray services. Indeed, it was well understood by Trident management and sales personnel that once Trident secured a SNF as a client, it would receive the entirety of that SNF's mobile imaging business, including Part A and the more lucrative Part B and Medicaid business.

73.    Here, as alleged below, Defendants are providing X-ray imaging services to the SNFs for their Part A patients at such a low cost that Defendants lose money on that Part A business.  Defendants are doing so with the intent to induce those SNFs to refer their lucrative Government Payor business to Defendants, which, as described below, is profitable, is paid by the government and not the SNFs, and more than makes up for any loss that Defendants suffer on the SNF's Medicare Part A business.

74.    If the SNF inpatient, who is covered by Part B, is ineligible for Part A or has exhausted his or her benefits under Part A, the costs of radiology services are covered under Part B. Medicare Part A covers only the first 100 days of inpatient treatment in a SNF. Thereafter,

services would be covered under Part B. *See* Rubertino RN, Frosini, <u>The Medicare Billing Manual for Long Term Care</u>, HCPro Inc.; 1st ed. (March 20, 2013)

     75.    In the case of radiology services covered by Medicare Part B, Defendants bill Medicare directly and are paid by Medicare on a per service basis at the Medicare fee schedule rate. Defendants are required by statute to charge the Government their usual and customary rates for each X-ray or other imaging service. However, Defendants simply charge the Government the maximum amount the Government will pay under Medicare Part B, which is far greater than the amount Defendants charge SNFs for the services they deliver to the patients covered by Medicare Part A.

     76.    As shown in a TridentUSA Management Presentation dated June 2011 (p. 28), Medicare Part B is an extremely important source of revenue for Trident, accounting for approximately 43% of its entire revenues in 2010:



77.     Per 2010 pro forma financial statement released in April 2011 (set forth below), Medicare Part B business accounted for 54% of MobilexUSA's revenues[13] while business where the facility directly pays Defendants accounted for 38% (comprised of Medicare Part A (30%) and correctional/contract (8%)).[14]

78.     Together, Medicare Parts A and B accounted for 84% of MobilexUSA's revenues[15], making facilities that offer both Part A and Part B business vital clients for Defendants. The mobile X-ray imaging business accounted for 74% of MobilexUSA's total revenues.

**Trident 2010PF Revenue Payor / Service Mix**
($ in millions)

| CONSOLIDATED | Professional | Technical | Transport / Travel | Setup | Lab Test | Lab Draw | Bundled | Total |
|---|---|---|---|---|---|---|---|---|
| Medicare Part B | 10.4 | 15.7 | 50.9 | 8.4 | | | | 85.4 |
| Facility (Medicare Part A) | 0.0 | 38.7 | 0.5 | 0.0 | | | 20.6 | 59.8 |
| Commercial / Private | 1.2 | 3.1 | 6.3 | 1.0 | | | | 11.6 |
| Medicaid | 0.3 | 0.7 | 0.9 | 0.0 | | | | 1.8 |
| Total | 11.9 | 58.1 | 58.6 | 9.4 | 0.0 | 0.0 | 20.6 | 158.6 |

| X-RAY | Professional | Technical | Transport / Travel | Setup | Lab Test | Lab Draw | Bundled | Total |
|---|---|---|---|---|---|---|---|---|
| Medicare Part B | 7 | 10 | 51 | 8 | N/A | N/A | | 76.9 |
| Facility (Medicare Part A) | - | 32 | - | - | N/A | N/A | 20 | 51.5 |
| Commercial / Private | 1 | 2 | 6 | 1 | N/A | N/A | | 10.4 |
| Medicaid | 0 | 0 | 1 | 0 | N/A | N/A | | 1.5 |
| Total | 8.1 | 44.7 | 58.1 | 9.4 | N/A | N/A | 19.9 | 140.3 |

| ULTRASOUND | Professional | Technical | Transport / Travel | Setup | Lab Test | Lab Draw | Bundled | Total |
|---|---|---|---|---|---|---|---|---|
| Medicare Part B | 3 | 5 | | N/A | N/A | N/A | | 8.5 |
| Facility (Medicare Part A) | - | 7 | 0 | N/A | N/A | N/A | 1 | 8.2 |
| Commercial / Private | 0 | 1 | | N/A | N/A | N/A | | 1.2 |
| Medicaid | 0 | 0 | | N/A | N/A | N/A | | 0.4 |
| Total | 3.8 | 13.4 | 0.5 | N/A | N/A | N/A | 0.7 | 18.3 |

79.     As shown below, the prices Defendants charged nursing homes for mobile X-ray imaging services for Medicare Part A patients are below its variable costs, are commercially unreasonable and/or are well-below fair market value, acting as an inducement for those nursing homes to refer their Government Payor business to Defendants.

---

[13] $85.4M/$158.6M

[14] $59.8M/$158.6M = 38%. If you take $11.2M for FACs, correctional, contract, industrial, etc. out of $59.8M: $59.8M - $11.2M = $48.6M; $48.6M/$158.6M = 30.6% ; $11.2M/$158.6M = 7.1%.

[15] ($84.5M+$48.6M)/$158.6M = 84%

80.     For nursing homes that were not in a position to refer Medicare Part B business, Defendants charged them a much higher price for X-ray services provided to Part A patients than it did for nursing homes that were able to refer Part B business.

81.     Defendants knowingly provided these services to SNF Part A patients at a huge discount in exchange for a commitment or understanding by the SNF to employ Defendants to provide mobile X-ray imaging services for all of the SNF's business, including Part B and Medicaid patients. The commitment or understanding to refer all of the SNF's business was either express or implied since SNFs generally used one provider for their mobile X-ray needs.

**B.      Defendants Charge Nursing Homes that Can Refer Part B Business a Discounted Rate for X-rays on Part A Patients that is Below Defendants' Costs and/or is Commercially Unreasonable**

82.     Defendants priced their Medicare Part A services (either as a flat rate per X-ray per patient encounter, as an X-ray price per diem rate or as a discounted rate from the Medicare Part B fee schedule established by Medicare) impermissibly low in order to get Part A business from a facility and in order to induce the referral of Part B and Medicaid business from the same facility, violating the AKS. Indeed, Defendants priced their Part A business below their own actual variable costs without taking into account any fixed costs whatsoever, making the prices commercial unreasonable and unprofitable without being shored up by the lucrative Part B and Medicaid business.

**1.      Defendants' Total Average Variable Cost ("Cost") Per X-Ray Patient Encounter Is Approximately $73**

83.     A MobilexUSA X-ray technician sometimes takes more than one X-ray when he examines a patient at a SNF.  Across all patients, MobilexUSA technicians take on average approximately 1.18 X-rays during each patient encounter.  When Defendants bill a facility a fixed price per X-ray (as opposed to a per diem rate), Defendants charge one price for the patient's

30

encounter with the X-ray technician, no matter the number of X-rays taken at that time. In an email dated July 14, 2011, Bill Glynn, President of MobilexUSA, confirmed this to Relator.

84.     The average variable cost of a product is the total variable costs of making a product divided by the total number of products made.  The same holds true for a service.  As computed below through regression analysis, Defendants' total average variable cost ("Cost") per X-ray patient encounter was approximately $73. This metric specifically does not include any allocation of fixed costs, or overhead costs necessary to operate the business. Thus, Relator is comparing the discounted rate Defendants gave to SNFs with Medicare Part B and Medicaid business to refer, to Defendants' actual variable costs without any fixed costs. This is the narrowest measurement of cost possible and is a narrower measurement of cost than some government guidance states is necessary to find a violation of the AKS.  Relator specifically does not use "total costs" or "fully loaded costs" as a basis for comparison.

85.     As shown in Trident's 2010 Fixed/Variable Cost Analysis, some expenses necessary to operate Defendants' X-ray business are entirely or predominantly fixed costs, such as:

- rent (entirely fixed)
- telecommunications (entirely fixed)
- sales and marketing (predominantly fixed)
- insurance (predominantly fixed)
- legal and other professional services (predominantly fixed)
- general and administrative (predominantly fixed)

Others expenses are predominantly variable, such as:

- transportation
- repairs and maintenance
- salary/wage/benefit

And some expenses have both variable and fixed components in approximately equal measure:

- lab and imaging supplies

31

- contractors

86.     Because many of the expense categories set forth above are comprised of both fixed and variable cost components, one cannot simply add certain expense categories to compute total variable costs. Thus, the best way to compute total variable costs is through a regression analysis.

87.     Regression analysis is a statistical technique that can identify relationships between multiple variables such as total cost, variable cost and fixed cost. The mathematical formula for regression analysis is depicted by $Y = a + bX$.  In this equation applied here, Y represents total cost. Since "a" is a constant, it represents fixed cost. Similarly, X represents the number of X-rays taken and "b" is a constant that represents the average variable cost per X-ray taken. If total cost (Y) and number of X-rays taken (X) is known for multiple years, then regression analysis can be used to determine constants "a" (fixed cost) and "b" (average variable cost/X-ray). Regression analysis works here because total cost is the sum of fixed cost and total variable cost.

88.     Total costs are derived from the following Income Statement of Defendants for the 2009 fiscal year (January through December), 2010 fiscal year, and for the time period of June 2010 through May 2011.  This Income Statement was prepared as of July 18, 2011 by Ernst and Young in connection with the valuation of Trident for a potential sale of the Company to private equity investors. Relator had direct access to this document as a member of the Trident senior management due diligence team in June 2011 assembled to work on this potential sale, which was not consummated.

**Exhibit 2.2 - MBX reported detailed historical PL**

| Currency: $ 000 | FY09 | FY10 | TTM11 | 5m10 | 5m11 |
|---|---|---|---|---|---|
| Services | 119,495 | 142,443 | 154,907 | 58,707 | 71,171 |
| Provision for Bad Debt | 5,006 | 4,112 | 4,131 | 2,213 | 2,232 |
| **Net revenue** | **114,489** | **138,331** | **150,776** | **56,494** | **68,939** |
| | | | | | |
| Salary and Wages | 42,431 | 50,519 | 53,360 | 19,997 | 22,838 |
| Group Health Insurance | 3,160 | 4,324 | 4,745 | 1,551 | 1,972 |
| Overtime Wages | 3,524 | 4,584 | 4,727 | 1,945 | 2,088 |
| FICA tax | 3,922 | 4,404 | 4,606 | 1,952 | 2,154 |
| Benefit Wages | 2,903 | 3,844 | 3,802 | 1,512 | 1,470 |
| On Call Pay | 3,393 | 2,645 | 2,549 | 1,153 | 1,057 |
| Workers' Compensation | 1,339 | 1,388 | 1,834 | 676 | 1,122 |
| Bonus | 922 | 1,139 | 1,230 | 449 | 540 |
| Commissions | 725 | 857 | 844 | 406 | 393 |
| State Unemployment & Local Tax | 441 | 644 | 739 | 533 | 628 |
| Management Bonuses | 161 | 360 | 446 | 150 | 236 |
| Car Allowance | 284 | 359 | 364 | 141 | 146 |
| Other Employee Benefits | 129 | 138 | 166 | 32 | 60 |
| 401K Employer Match | 144 | 161 | 161 | - | - |
| Federal Unemployment Tax | 72 | 84 | 92 | 70 | 78 |
| **Salary/ Wage/ Benefit** | **63,551** | **75,450** | **79,667** | **30,567** | **34,784** |
| *Group Health Inc as a % of salary & wages* | *7.4* | *8.6* | *8.9* | *7.8* | *8.6* |
| *Benefit wages as a % of salary & wages* | *8.3* | *9.1* | *8.9* | *9.7* | *9.1* |
| *Overtime wages as a % of salary & wages* | *8.3* | *9.1* | *8.9* | *9.7* | *9.1* |
| | | | | | |
| Radiologist Fees | 10,020 | 11,818 | 12,865 | 4,920 | 5,967 |
| Cardiologist Fees | 6 | 16 | 8 | 14 | 6 |
| ADS U/S Contract Services | 852 | - | - | - | - |
| **Physician fees** | **10,878** | **11,834** | **12,873** | **4,934** | **5,973** |
| Mileage | 2,668 | 3,589 | 3,987 | 1,424 | 1,822 |
| Auto Repairs and Maintenance | 1,647 | 1,571 | 1,709 | 630 | 768 |
| Lease-Automobiles | 421 | 497 | 374 | 262 | 139 |
| Rent-Auto | 56 | 50 | 56 | 15 | 21 |
| Navtrak Expense | - | 14 | 59 | - | 45 |
| **Transportation** | **4,792** | **5,721** | **6,185** | **2,331** | **2,795** |
| **Lab and imaging supplies** | **1,330** | **1,416** | **1,440** | **606** | **630** |
| Travel | 625 | 662 | 756 | 238 | 332 |
| Promotional / Selling Expense | 215 | 354 | 549 | 125 | 320 |
| Airline Travel | 255 | 352 | 434 | 119 | 201 |
| National Account Admin Fees | 104 | 337 | 333 | 133 | 129 |
| Meals and Entertainment | 260 | 275 | 238 | 111 | 74 |
| Meetings and Conferences | 66 | 82 | 95 | 36 | 49 |
| Advertising | 46 | 67 | 61 | 23 | 17 |
| Promotional Supplies | - | - | 23 | - | 23 |
| Customer Events | - | - | 21 | - | 21 |
| Sugar CRM Expenses | - | 5 | 6 | 2 | 3 |
| **Sales and marketing** | **1,571** | **2,134** | **2,516** | **787** | **1,169** |
| **Insurance** | **1,336** | **1,486** | **1,706** | **583** | **803** |
| **Repairs and Maintenance** | **1,632** | **2,034** | **2,090** | **779** | **835** |
| **Rent** | **2,508** | **2,815** | **2,882** | **1,163** | **1,230** |
| **Telecom** | **2,630** | **3,245** | **3,373** | **1,281** | **1,409** |
| **Legal and other professional fees** | **1,240** | **1,113** | **1,248** | **350** | **485** |
| **Contractors** | **275** | **342** | **256** | **198** | **112** |
| Billing Processing | 745 | 791 | 726 | 360 | 295 |
| Personal Property / Sales & Use Taxes | 505 | 587 | 646 | 209 | 268 |
| Office Supplies | 389 | 476 | 471 | 205 | 200 |
| Delivery/Freight | 338 | 350 | 371 | 143 | 164 |
| Postage | 256 | 369 | 360 | 157 | 148 |
| Utilities | 274 | 333 | 326 | 137 | 130 |
| Forms and Printing | 241 | 228 | 304 | 75 | 151 |
| Recruiting Expense | 148 | 99 | 163 | 56 | 120 |
| Seminars and Courses | 88 | 108 | 156 | 35 | 83 |
| Employee Training | 135 | 115 | 106 | 50 | 41 |
| Miscellaneous | 64 | 177 | 105 | 86 | 14 |
| Bank Charges | 98 | 108 | 100 | 44 | 36 |
| Uniforms | 81 | 69 | 80 | 21 | 32 |
| Cleaning Services | 33 | 59 | 68 | 24 | 33 |
| Dues and Subscriptions | 83 | 89 | 57 | 61 | 29 |
| Overnight Services | 1 | 45 | 56 | 29 | 40 |
| Employee Moving | - | 1 | 30 | - | 29 |
| Employee Hiring | 4 | 11 | 11 | 2 | 2 |
| Miscellaneous Revenue | (40) | - | 8 | (32) | (24) |
| Home Office Expense | 10 | 10 | 7 | 3 | - |
| Licenses | 2 | 2 | 1 | 2 | 1 |
| Penalties | 2 | 2 | 1 | 2 | 1 |
| Other taxes | - | - | - | - | - |
| **General and administrative** | **3,457** | **4,029** | **4,153** | **1,669** | **1,793** |
| | | | | | |
| **EBITDA** | **19,289** | **26,712** | **32,387** | **11,246** | **16,921** |

89.     This Income Statement yields the following summary total cost information after excluding physician fees which are separately billed and not relevant to this analysis:

|  | Total Cost | Patients X-rayed |
|---|---|---|
| 2009 | $  84,322,000 | 961,916 |
| 2010 | $  99,785,000 | 1,163,013 |
| Jun-May 2011 | $ 105,516,000 | 1,254,641 |

90.     Using total cost (Y) and number of X-rays taken (X) from the table above results in the following regression analysis:

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.998918834 |
| R Square | 0.997838836 |
| Adjusted R Square | 0.995677672 |
| Standard Error | 720761.0478 |
| Observations | 3 |

ANOVA

|  | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 2.39859E+14 | 2.4E+14 | 461.7137 | 0.029606053 |
| Residual | 1 | 5.19496E+11 | 5.19E+11 | | |
| Total | 2 | 2.40378E+14 | | | |

|  | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | 14,150,105.60 | 3856874.388 | 3.668801 | 0.169407 | -34856130.02 | 63156341.22 | -34856130.02 | 63156341.22 |
| X Variable 1 | 73.13731724 | 3.403710885 | 21.48752 | 0.029606 | 29.88906987 | 116.3855646 | 29.88906987 | 116.3855646 |

RESIDUAL OUTPUT

| Observation | Predicted Y | Residuals |
|---|---|---|
| 1 | 84502061.24 | -180061.2428 |
| 2 | 99209756.33 | 575243.6732 |
| 3 | 105911182.4 | -395182.4304 |

**X Variable 1 Line Fit Plot**



91.     This regression analysis creates the following equation: Total Cost = $14,150,106 + $73 * Number of Patients X-rayed. Thus, the total variable cost per X-ray is $73.[16]

92.     The following table confirms the accuracy of the regression analysis and validates the computation of the $73 variable cost and the $14,150,106 in fixed costs. Plugging the Number of Patients X-rayed into the equation "Total Cost = $14,150,106 + $73 * Number of Patients X-

---

[16] "Cost per X-ray" means the cost of all X-rays taken for a single patient during a single encounter between the patient and an X-ray technician.

34

rayed" that the regression analysis produced, the answer (Total Cost) yields the same amount as the Actual Total Cost in the Income Statement set forth above.

| | Actual Total Cost | Patients X-rayed | Variable Cost = Patients X-rayed * 73 | Fixed Cost | Total Cost = Patients X-rayed * Variable Cost + Fixed Cost |
|---|---|---|---|---|---|
| 2009 | $ 84,322,000 | 961,916 | 70,219,868 | $ 14,150,106 | 84,369,974 |
| 2010 | $ 99,785,000 | 1,163,013 | 84,899,949 | $ 14,150,106 | 99,050,055 |
| Jun-May 2011 | $ 105,516,000 | 1,254,641 | 91,588,793 | $ 14,150,106 | 105,738,899 |

93.    The $73 variable cost is further confirmed by Trident's own business models (Confidential Information Memorandum prepared by Trident in June of 2011, pages 56 - 58), where Trident assumed that 10% of its total portable X-ray costs were fixed and 90% were variable, acknowledging that its variable costs are the most significant element of its total costs.

Assumption in model  10%

94.    Applying those percentages to the regression analysis equation using the 2010 TridentUSA data set forth in the table above yields a $77 variable cost per patient X-ray encounter, which is even higher than the $73 calculated above and calls into question even more of Defendants' X-ray pricing to SNFs as being below its total variable costs.

Total Cost = Fixed Cost + (Number of Units Produced * Variable Cost/Unit)
$99,785,000 million = $9.9 million [10% of fixed cost] + (1,163,013 * Variable Cost/Unit)
Variable Cost/Unit = $77

95.    In addition, MobilexUSA calculated its total cost per patient for 2009 and 2010 as follows:

| Mobilex Cost Detail | | |
| --- | --- | --- |
| | **FY09** | **FY10** |
| Patient Count | 961,916 | 1,163,013 |
| Total Costs | 94,775,305 | 111,618,427 |
| **Cost per patient** | **98.53** | **95.97** |

Based on Defendant's model in Financial Year (FY) 2010, above, MobilexUSA's total cost per patient was $95.97. If 90% of this is variable (as Trident indicated in its own business models), 90% of $95.97 is $86 per patient in variable costs. After subtracting $9 in physician fees, the variable cost per patient is $77. Thus, based on Defendant's own documents, MobilexUSA's variable cost per patient was $77, even higher than the $73 calculated above and calling into question even more of Defendants' X-ray pricing to SNFs as being below its Costs.

## 2.    Defendants Charge SNFs Below Cost Prices For Mobile X-Rays

96.    Relator estimates that of the approximately 3,760 SNFs to which MobilexUSA regularly provides mobile X-ray services, MobilexUSA charges approximately 25% of them for mobile X-rays a price per patient encounter that is below its $73 variable X-ray cost per patient encounter, in order to induce those SNFs to contract with MobilexUSA for mobile imaging services for all of their Medicare business, including the more lucrative Government Payor business, which makes up for the loss in the Medicare Part A business. If Defendants' own model number of an $77 variable cost is used, a much higher percentage (approximately 30%) of SNFs were charged a kickback price, rendering more claims from those SNFs who accepted those prices false claims.

36

97.     For example, MobilexUSA has contracted with or billed the following healthcare companies that own or operate a chain of SNFs to provide mobile X-ray services for Medicare Part A patients at a price less than its $73 average variable X-ray cost per patient encounter:

| SNF Chain Corp | 2011 Revenue | Estimated Patient Encounters | Estimated Price Per Patient Encounter [17] |
|---|---|---|---|
| UNITED CHURCH HOME | $ 181 | 7 | $ 25 |
| SCHACTER | $ 13,366 | 415 | $ 32 |
| OMNI | $ 37,387 | 1,022 | $ 37 |
| ATRIUM CENTER, LLC | $ 32,221 | 854 | $ 38 |
| CONTINUUM HEALTH CARE | $ 3,802 | 98 | $ 39 |
| NEWCARE HEALTH CARE | $ 2,445 | 56 | $ 44 |
| SOUTHWEST LTC | $ 888 | 20 | $ 45 |
| PROGRESSIVE QUALITY CARE | $ 11,222 | 244 | $ 46 |
| DELMAR GARDENS ENTERPRISE | $ 9,392 | 202 | $ 47 |
| PLATINUM HEALTHCARE | $ 1,843 | 38 | $ 49 |
| MAGNOLIA HEALTH SYSTEMS | $ 28,139 | 554 | $ 51 |
| HEALTH CARE CORP | $ 3,253 | 60 | $ 55 |
| JAMESTOWN MANAGEMENT | $ 2,959 | 54 | $ 55 |
| RON COLLI MANAGEMENT | $ 3,442 | 62 | $ 55 |
| NEXION HEALTH | $ 35,450 | 630 | $ 56 |
| HEALTH SERVICES MANAGEMENT OF TEXAS | $ 27,186 | 476 | $ 57 |
| TUTERA GROUP INC. | $ 5,787 | 97 | $ 60 |
| NEW HAMPSHIRE CATHOLIC CHARITIES | $ 11,769 | 196 | $ 60 |
| PARADIGM HEALTHCARE DEVELOPMENT | $ 15,941 | 263 | $ 61 |
| SISTERS OF PROVIDENCE HEALTH SYSTEM | $ 4,379 | 71 | $ 62 |
| KINGSTON HEALTH CARE | $ 6,018 | 98 | $ 62 |
| CAMBRIDGE PROCUREMENT, LLC | $ 41,037 | 662 | $ 62 |
| WATERS | $ 36,348 | 577 | $ 63 |
| NHC | $ 3,858 | 61 | $ 63 |
| HAVEN HEALTHCARE | $ 3,586 | 54 | $ 66 |
| ENSIGN GROUP | $ 10,493 | 158 | $ 66 |
| PARAMOUNT HEALTHCARE | $ 10,035 | 150 | $ 67 |
| ST JOHN HEALTH SYSTEM | $ 1,926 | 29 | $ 67 |
| ACTS RETIREMENT LIFE COMMUNITIES | $ 11,302 | 167 | $ 68 |
| WILLOW VALLEY RETIREMENT COMMUNITIES | $ 6,414 | 94 | $ 68 |
| **Total** | **$ 382,069** | **7,466** | **$ 51** |

98.     MobilexUSA's contracts with SNF chains to provide mobile X-ray services for Medicare Part A patients covered all of the SNF patients, and Relator believes and contends that SNFs in nearly every case contracted with and used only one provider for mobile X-ray services. A form Mobile Diagnostic Services Agreement states that:

---

[17] Estimated Price Per Patient Encounter is based on MobilexUSA's monthly Accounts Receivables for Part A patients and its total monthly patient encounters for Medicare Part A patients (computed by multiplying MobilexUSA's total monthly patient encounters by 40%, which is the percentage of its patients that MobilexUSA data shows are Part A patients).

1.    Services.    MobilexUSA shall provide portable x-ray, EKG and ultrasound services (Provided by our Ultrasound Division, American Diagnostics Services, Inc) to residents or patients of the Facility, only on the order of a duly licensed and authorized physician.  All x-

Thus, MobilexUSA obtained the entirety of the SNFs Part A, Part B and Medicaid business through a single contract. Further, because the contract did not contain a "true up provision," Defendants' below Cost pricing to SNFs on the Part A business was not recouped based on Defendants' actual costs to provide the imaging services to those Part A patients. The only way Defendants had to recover and did recover their losses on the Part A business was through supplying imaging services under the same contract to the SNF's Government Payor patients, where the reimbursement were profitable for the SNFs.

99.    Furthermore, Trident's own National Pricing List shows that several SNF chains received contractual prices for mobile X-rays for some or all of their facilities that were below MobilexUSA's Cost per X-ray per patient encounter, as follows:

|   | SNF Corporate Chain | X-ray Price Per Patient | Number of Facilities at this Price |
|---|---|---|---|
| 1 | Kindred Healthcare, Inc. | $67 | 92 |
| 2 | Life Care Centers of America | $70 | 1 |
| 3 | Sun Healthcare Group, Inc. | $65 | 19 |
| 4 | LaVie | $63 | 1 |
| 5 | Lifecare Corporation | $60 | 1 |
| 6 | National Healthcare | $65 | 1 |
| 7 | Five Star Quality Care | $65 | 2 |
| 8 | Care One | $66 | 22 |
| 9 | Diversicare | $65 | 2 |
| 10 | Ciena Healthcare | $67 | 1 |
| 11 | Vetter Health Services | $70 | 1 |
| 12 | Medical Facilities of America | $65 | 11 |
| 13 | Apple-Rehab Corporate | $70 | 13 |
| 14 | Athena | $67 | 2 |
| 15 | Wingate Healthcare | $70 | 6 |
| 16 | Erickson | $70 | 7 |

The National Pricing List also includes SNF chains that Trident charged per diem pricing below MobilexUSA's Cost per X-ray per patient encounter.

100.    MobilexUSA has charged the following individual SNFs in 2010 and 2011 the following prices to provide mobile X-ray services for Medicare Part A patients, which are less than Relator's conservatively-estimated $73 Cost per patient encounter:

| SNF Name | SNF Chain Corp Name | Estimated X-ray Price Per Patient in 2010[18] |
|---|---|---|
| PLUM CREEK HEALTHCARE | ENCORE HEALTHCARE, LLC | $25 |
| OAKWOOD NURSING & REHABILITATION | DAYBREAK VENTURES | $25 |
| LIFE CARE CENTER - ACTON | LIFE CARE CENTERS OF AMERICA | $25 |
| LIFE CARE RAYNHAM | LIFE CARE CENTERS OF AMERICA | $25 |
| WHITE OAK HEALTH CAMPUS | TRILOGY HEALTH SERVICE, LLC | $25 |
| OAKLAWN | | $35 |
| EVANSVILLE PROTESTANT HOME | | $35 |
| CRANE NURSING & REHAB CENTER | SENIOR MANAGEMENT SERVICES | $40 |
| PINE KNOLL NURSING CENTER | | $50 |
| DARWAY NURSING | | $50 |
| HERITAGE MANOR - ELGIN | | $55 |
| ARBOR TRACE HEALTH AND LIVING | CARDON ASSOCIATES | $60 |
| COLONIAL BELLE NURSING HOME | | $60 |
| MEADOWOOD HEALTH PAVILION | FIVE STAR QUALITY CARE | $60 |
| BROWN COUNTY HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | $60 |
| PAOLI HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | $60 |
| LYONS HEALTH AND LIVING CENTER | CARDON ASSOCIATES | $60 |
| POMPERAUG WOODS | LIFE CARE SERVICES | $60 |

| SNF Name | SNF Chain Corp Name | Estimated X-ray Price Per Patient in 2011[18] |
|---|---|---|
| EL PASO HEALTH AND REHAB | ADVANCED HEALTHCARE SOLUTIONS | $25 |
| HARBOURWOOD HEALTH AND REHAB CENTER | SENIOR CARE GROUP, INC. | $25 |
| LIFE CARE CENTER - ACTON | LIFE CARE CENTERS OF AMERICA | $25 |
| LIFE CARE RAYNHAM | LIFE CARE CENTERS OF AMERICA | $25 |
| THE OAKS | LIFE CARE CENTERS OF AMERICA | $25 |
| EVANSVILLE PROTESTANT HOME | | $35 |
| PINE KNOLL NURSING CENTER | | $50 |
| CARLETON NURSING HOME | | $50 |
| LEXINGTON OF LAKE ZURICH | | $55 |
| ELMHURST EXTENDED CARE | | $55 |
| HERITAGE MANOR - ELGIN | | $55 |
| SERENITY HILL | | $59 |
| SHERIDAN HEALTH CARE CENTER | | $60 |
| ARBOR TRACE HEALTH AND LIVING | CARDON ASSOCIATES | $60 |
| COMMUNITY NURSING & REHAB CTR | | $60 |
| BROWN COUNTY HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | $60 |

---

[18] The Estimated X-ray Price Per Patient is based on MobilexUSA's monthly Accounts Receivables for Part A patients and its total monthly patient encounters for Medicare Part A patients.

101.   MobilexUSA has charged the following individual SNFs that are located in the
Eastern District of Pennsylvania the following prices in 2011 to provide mobile X-ray services
for Medicare Part A patients, which are less than Relator's conservatively-estimated $73 Cost per
patient encounter:

| Facility Id | SNF Name | State | Corporate Chain | Street Address | City | Zip | County | Estimated Price Per Patient |
|---|---|---|---|---|---|---|---|---|
| 55178 | CHRIST'S HOME RETIREMENT COMMUNITY | PA | | 1220 W. STREET ROAD | WARMINSTER | 18974 | Bucks | $39 |
| 55218 | KEARSLEY LONG TERM CARE CENTER | PA | NEWCOURTLAND, INC. | 2100 N 49TH STREET | PHILADELPHIA | 19131 | Philadelphia | $46 |
| 55346 | MARTIN'S RUN CARE CENTER | PA | | 11 MARTINS RUN | MEDIA | 19063 | Delaware | $49 |
| 55431 | PARK HOUSE PROVIDENCE POINT | PA | | 1600 BLACK ROCK RD. | ROYERSFORD | 19468 | Montgomery | $54 |
| 20009 | PLEASANT VIEW RETIREMENT COMMUNITY | PA | | 544 N PENRYN ROAD | MANHEIM | 17545 | Lancaster | $56 |
| 52044 | EASTON NURSING CENTER | PA | PENN MED CONSULTANTS | 498 WASHINGTON STREET | EASTON | 18042 | Northampton | $70 |
| 52100 | AUDUBON VILLA | PA | PENN MED CONSULTANTS | 125 SOUTH BROAD STREET | LITITZ | 17543 | Lancaster | $38 |
| 52109 | HIGHLAND MANOR NURSING & CONVALESCENT | PA | SENIORS NORTH INC | 750 SCHOOLEY AVE | EXETER | 18643 | Berks | $71 |

102.   In 2011, MobilexUSA charged the following SNFs the following prices for mobile
X-ray services provided to the following individual Medicare Part A patients, which are less than
its $73 average variable X-ray cost per patient encounter:

| Service Date | Patient Id | State | Facility_Name | CorpName | CPT Codes | Billed Amount |
|---|---|---|---|---|---|---|
| 4/1/2011 | Patient 500 | NJ | BARNEGAT NURSING CENTER | SENIORS NORTH INC | 71010 | $20 |
| 4/1/2011 | Patient 501 | TX | PARKVIEW CARE CENTER | ADVANCED HEALTHCARE SOLUTIONS | 71010 | $25 |
| 4/1/2011 | Patient 502 | MD | REEDERS MEMORIAL HOME | CONSULATE HEALTH CARE | 73130, Q0092 | $31 |
| 4/1/2011 | Patient 503 | FL | CARROLLWOOD CARE CENTER | AIRAMID HEALTH CARE MANAGEMENT | 73130, Q0092 | $33 |
| 4/1/2011 | Patient 504 | PA | MANORCARE - YORK NORTH | HCR MANORCARE HEALTH SERVICES | 73620, Q0092 | $33 |
| 4/1/2011 | Patient 505 | IN | HOOVERWOOD NURSING HOME | | 71010 | $35 |
| 4/1/2011 | Patient 506 | AL | ST MARTINS IN THE PINES | | 71010 | $35 |
| 4/1/2011 | Patient 507 | AL | ST MARTINS IN THE PINES | | 71010 | $35 |
| 4/1/2011 | Patient 508 | NJ | ANDOVER SUBACUTE & REHAB CENTER - BLDG #2 | | 71010 | $45 |
| 4/1/2011 | Patient 509 | NJ | ANDOVER SUBACUTE & REHAB CENTER - BLDG #2 | | 71010 | $45 |
| 4/1/2011 | Patient 510 | NJ | ANDOVER SUBACUTE & REHAB CENTER - BLDG #2 | | 71010 | $45 |
| 4/1/2011 | Patient 511 | TX | MANORCARE FORT WORTH - NRH | HCR MANORCARE HEALTH SERVICES | 71010 | $45 |
| 4/1/2011 | Patient 512 | PA | GREEN RIDGE HEALTH CARE CENTER | | 73610, 73560 | $47 |
| 4/1/2011 | Patient 513 | IL | BURGESS SQUARE HEALTHCARE & REHAB CENTER | | 73510, Q0092, R0070 | $50 |
| 4/1/2011 | Patient 514 | IL | BURGESS SQUARE HEALTHCARE & REHAB CENTER | | 71020, Q0092, R0070 | $50 |
| 4/1/2011 | Patient 515 | WI | GOLDEN LIVING CENTER - HERITAGE SQUARE | GOLDEN LIVING | 71020 | $60 |
| 4/1/2011 | Patient 516 | WI | GOLDEN LIVING CENTER - HERITAGE SQUARE | GOLDEN LIVING | 71020 | $60 |
| 4/1/2011 | Patient 517 | CT | HEBREW HOME & HOSPITAL | | 71010 | $60 |
| 4/1/2011 | Patient 518 | CT | HEBREW HOME & HOSPITAL | | 71010 | $60 |

[19]

103.   Harrisonburg Health & Rehabilitation Center, a SNF owned by Medical Facilities
of America, was consistently charged for Medicare Part A mobile X-rays a rate that was well
below MobilexUSA's $73 Cost per patient encounter. The charges below appeared in the data files

---

[19] Billed Amount is based on the actual amount that MobilexUSA billed to the SNF under the Patient ID.

that were used to generate actual bills that MobilexUSA sent to Harrisonburg Health & Rehabilitation Center:

| Service Date | Patient Id | State | Facility_Name | CorpName | CPT Codes | Billed Amount |
|---|---|---|---|---|---|---|
| 3/1/2011 | Patient 100 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/3/2011 | Patient 101 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/4/2011 | Patient 102 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/5/2011 | Patient 103 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/9/2011 | Patient 104 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/12/2011 | Patient 105 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/18/2011 | Patient 106 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/21/2011 | Patient 107 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/22/2011 | Patient 108 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/25/2011 | Patient 109 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 71010 | $23 |
| 3/29/2011 | Patient 110 | FL | HAINES CITY HEALTH CARE | MK MANAGEMENT | 71010 | $25 |
| 3/2/2011 | Patient 111 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 73630 | $31 |
| 3/8/2011 | Patient 112 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 73080 | $34 |
| 3/9/2011 | Patient 113 | VA | HARRISONBURG HEALTH & REHABILITATION CENTER | MEDICAL FACILITIES OF AMERICA | 73510 | $38 |
| 3/17/2011 | Patient 114 | NJ | MANORCARE - NEW PROVIDENCE | HCR MANORCARE HEALTH SERVICES | 71010 | $45 |
| 3/18/2011 | Patient 115 | NJ | MANORCARE - NEW PROVIDENCE | HCR MANORCARE HEALTH SERVICES | 71010 | $45 |
| 8/6/2010 | Patient 116 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/2/2011 | Patient 117 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 74000 | $60 |
| 3/2/2011 | Patient 118 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/4/2011 | Patient 119 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/9/2011 | Patient 120 | IN | PAOLI HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | 73550, 73562 | $60 |
| 3/13/2011 | Patient 121 | IN | PAOLI HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | 73110, 73130 | $60 |
| 3/18/2011 | Patient 122 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/23/2011 | Patient 123 | IN | PAOLI HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/25/2011 | Patient 124 | IN | PAOLI HEALTH AND LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/28/2011 | Patient 125 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/28/2011 | Patient 126 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 73060 | $60 |
| 3/29/2011 | Patient 127 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 71020 | $60 |
| 3/30/2011 | Patient 128 | IN | GREENWOOD HEALTH & LIVING COMMUNITY | CARDON ASSOCIATES | 73610 | $60 |

104.    Just like SNFs, Defendants also gave Assisted Living Facilities (ALFs)[20] pricing on mobile X-ray imaging services that was below its Costs and was commercially unreasonable. Examples of Defendants' cut rate X-ray pricing to ALFs include:

---

[20] The difference between a SNF and an ALF is as follows: "Skilled nursing services are most often needed following a hospitalization or significant decline in health. A stay in a skilled nursing facility is usually temporary in nature and is focused on rehabilitation that is intended to prepare the resident to return to their independent apartment. Assisted living services typically provide assistance with bathing, dressing, grooming, medications, and meal preparation. This support is provided in a setting that is, by design, residential in nature and is intended not to be temporary." http://shellpoint.org/blog/2012/06/01/the-difference-between-assisted-living-and-skilled-nursing/

| Assisted Living Facility | Corporate Chain Name | State | Zip | Estimated Price/Patient [21] |
|---|---|---|---|---|
| ARDEN COURTS - KENSINGTON | HCR MANORCARE HEALTH SERVICES | MD | 20895 | $45 |
| ARDEN COURTS-JEFFERSON HILLS | HCR MANORCARE HEALTH SERVICES | PA | 15025 | $45 |
| WESTMINSTER SHORES BRADENTON | | FL | 34205 | $25 |
| SPRINGHOUSE ASSISTED LIVING - BETHESDA | HCR MANORCARE HEALTH SERVICES | MD | 20814 | $45 |
| HAWTHORNE INN ALF BRANDON | | FL | 33511 | $25 |
| SPRINGHOUSE ASSISTED LIVING - SILVER SPRING | HCR MANORCARE HEALTH SERVICES | MD | 20910 | $45 |
| BAY VILLAGE | | FL | 34231 | $30 |
| ARDEN COURTS - PIKESVILLE | HCR MANORCARE HEALTH SERVICES | MD | 21208 | $45 |
| ARDEN COURTS-POTOMAC | HCR MANORCARE HEALTH SERVICES | MD | 20854 | $45 |
| BROOKSHIRE ASSISTED LIVING | LAVIE | FL | 32901 | $45 |
| ARDEN COURTS OF WINTER SPRINGS | HCR MANORCARE HEALTH SERVICES | FL | 32708 | $45 |
| GOLDEN POND - WINTER GARDEN | | FL | 34787 | $55 |
| SUNRISE VILLAGE | AIRAMID HEALTH CARE MANAGEMENT | FL | 33612 | $25 |
| CROWN POINTE | | FL | 33872 | $35 |
| ARDEN COURTS TAMPA | HCR MANORCARE HEALTH SERVICES | FL | 33624 | $45 |
| ARDEN COURTS-TOWSON | HCR MANORCARE HEALTH SERVICES | MD | 21204 | $45 |
| ARDEN COURT OF RICHARDSON | HCR MANORCARE HEALTH SERVICES | TX | 75081 | $45 |
| GINTER HALL-SOUTH | | VA | 23235 | $55 |
| AUTUMN HOUSE | | FL | 32940 | $45 |
| EMERITUS AT CROSSING PT | EMERITUS CORP | FL | 32837 | $35 |
| ADAMS HOUSE - TAMPA | | FL | 33629 | $55 |
| INDIGO PALMS AT MAITLAND | BROOKDALE SENIOR LIVING | FL | 32751 | $35 |
| ARDEN COURTS ALF PLM HRBR | HCR MANORCARE HEALTH SERVICES | FL | 34684 | $45 |
| SUNNY HILLS OF SEBRING | | FL | 33870 | $35 |
| ATRIUM CENTER JACKSONVILLE ALF/IND LIVING | BROOKDALE SENIOR LIVING | FL | 32225 | $25 |
| COURTYARD - SUN CITY | | FL | 33573 | $55 |
| VILLAGE AT WESTERVILLE RETIREMENT CENTER (THE) | HCR MANORCARE HEALTH SERVICES | OH | 43081 | $45 |
| ARDEN COURTS FORT MYERS | HCR MANORCARE HEALTH SERVICES | FL | 33908 | $45 |
| TOMBALL RETIREMENT CENTER | HEALTH SERVICES MANAGEMENT OF TEXAS | TX | 77375 | $25 |
| MONTGOMERY CHILDRENS SPEC. CTR. | Tutera Group | AL | 36110 | $20 |
| GULF COAST VILLAGE AL | | FL | 33991 | $25 |
| MONROE VILLAGE CLINIC | Springpoint Senior Living | NJ | 08831 | $50 |
| VILLAGE OAKS - ORANGE PARK | | FL | 32073 | $55 |

105.   ALFs are typically not approved to admit Medicare Part A patients.  Their residents are covered under Medicare Part B.  The pricing Trident gives directly to ALFs for X-rays (as in the chart above) covers those situations when the facility itself would be responsible for the X-ray charges instead of the government under Part B. These situations include the following:

- Some of the ALF beds may be certified for skilled nursing care under Part A.
- The ALF may be certified by Medicare for intermittent SNF care under Part A.
- The ALF may be responsible for paying for TB testing of new admissions.
- The ALF may be responsible for paying for TB testing of new employees.

106.   Defendants' below-variable-cost X-ray pricing to ALFs serves as a powerful inventive for the ALFs to refer their lucrative and predominant Government Payor business.

---

[21]Estimated Price/Patient is based on MobilexUSA's monthly Accounts Receivables for Part A patients and its total monthly patient encounters for Medicare Part A patients.

Furthermore, these ALFs are owned by corporate entities that also own or manage chains of SNFs. For example, Trident transacts about $10 million in business each year with HCR ManorCare (in the chart above), which owns both ALFs and SNFs. The below Cost pricing to the ALFs serve not only to induce Government Payor business from the ALF itself, but also from the SNFs owned by the same corporate entity.

107.    OIG Advisory Opinion 99-2 clearly states that "[i]n evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, we look for indicia that the discount is not commercially reasonable in the absence of other, non-discounted business.  In this regard, discounts on SNF PPS business that are particularly suspect include, but are not limited to: discounted prices that are below the supplier's cost…"  As such, Defendants' below Cost X-ray pricing indicates that their X-ray pricing discount is not commercially reasonable and that there is an improper nexus between the pricing and referrals, which violates the state and federal False Claims Acts.

### C.    Defendants Charge SNFs for X-rays on Medicare Part A Patients Much Less Than They Charge the Government for X-rays on Medicare Part B Patients

108.    The below Cost pricing that Defendants charge SNFs as set forth above is also drastically below (often less than half of) the amount that Defendants charge and are paid by CMS for X-ray services provided to Part B patients.

109.    The amount the Government reimburses MobilexUSA under Medicare Part B for mobile X-ray services depends on and is comprised of a combination of 3 components: (1) the cost of the X-ray exam itself (CPT or HCPCS code that starts with a 7); (2) the cost of setup; and (3) the transportation charge.[22] *See* MobileUSA Compliance Training 2000, Components of

---

[22] Diagnostic radiology services include both a technical and professional component.  The professional component – the radiologist's interpretation of the x-rays - is billed separately by the physician or the physician's assignees under Part B.  The technical component – the service performed by the portable x-ray supplier – is billed as described above.

Radiology Billing at pp 2-3.  Depending upon the reimbursement of these three components provided by the Medicare Fee Schedule, the Government is paying Defendants **approximately $140** for each X-ray administered to a Medicare Part B patient. For example, the breakdown of a Medicare Part B payment for one of Defendants' mobile X-ray exams might look like the following:

| Cpt code. | Procedure | Allowed amount |
|-----------|-----------|----------------|
| 71101 | X-ray exam | $24 |
| Q0092 | Setup | $21 |
| R0070 | Transportation | $94 |
| | | |
| Total: | | $139 |

110.    In contrast to the $140 Medicare Part B reimbursement amount for mobile X-ray services, Defendants charge many SNFs that have Part B business to refer much less (as set forth above), sometimes as little as $25 per X-ray for Medicare Part A patients (*See* ¶¶97-104 above), which is less than 18% of the amount that Defendants are paid by CMS for X-ray services provided to Part B patients.

111.    Because the Anti-Kickback Statute's discount safe harbor specifically excludes "a reduction in price applicable to one payor but not to Medicare or a State health program" (*see* 42 CFR §1001.952(h)(3)(iii); OIG Advisory Opinion 99-2 (March 4, 1999), at pg. 5), Defendants are not protected under the safe harbor and their below Cost pricing violates the Anti-Kickback Statute.

**D.     Defendants Charge Facilities That Do Not Have Medicare Part B Business to Refer Much More Per X-ray Than Those That Do Have Part B Business to Refer**

112.    The below Cost pricing discussed above that Defendants extend to certain SNFs to induce them to do business with Defendants and to refer their more lucrative Government Payor business is not extended to other types of facilities that use mobile X-ray imaging services, but

that do not have Government Payor business to refer to Defendants. These types of facilities pay a much higher X-ray price per patient encounter because they are not able to be induced to refer lucrative Government Payor business in exchange for below Cost pricing on Part A business simply because they don't have Government Payor business to refer.  Per OIG Advisory Opinion 99-2, this makes Defendants' below Cost pricing to SNFs with Government Payor business suspect and indicates that such below Cost pricing is not commercially reasonable in the absence of Part B business.

113.    Importantly, the price these types of facilities pay Defendants per X-ray patient encounter serves to establish the fair market value of a mobile X-ray provided by Defendants because it is a negotiated rate that is paid directly by the facility to Defendants as an out-of-pocket expense, without any third party paying entity, such as the government, involved.  As such, Defendants' below Cost pricing on Part A business provided to certain SNFs is also well below fair market value, which violates the AKS. *See United States ex rel. McDonough v. Symphony Diagnostic Services, Inc. et al.*, 2012 U.S. Dist. LEXIS 48026 at 23-24 (S.D. Ohio 2012) (defendant's "agreements with [nursing homes] to provide free or heavily discounted, below market x-ray services under Medicare Part A in exchange for exclusive referrals for the [nursing homes'] Medicare Part B services states a claim for relief from violations of the Anti-Kickback statute and the FCA."

### 1.   Defendants Charge Hospices, Which Have No Part B Business, More than SNFs, Which Do.

114.    Defendants use the term "Hospice" to denote in-patient facilities that provide end-of-life hospice care.[23]

---

[23] Trident provides mobile imaging services to a *de minimus* number of in-home hospice care patients.

115.     Hospices have **only** Medicare Part A business and no Part B business, because end-of-life hospice care is entirely covered under Part A for a terminal patient encounter.[24]

116.     Defendants charge Hospices that are not affiliated with a SNF, assisted living facility or hospital approximately $102 per X-ray patient encounter.

| Facility Type | 2010 Revenue* | 2011 Revenue | 2010 Patient Count | 2011 Patient Count | Average Price Charged in 2010 | Average Price Charged in 2011** |
|---|---|---|---|---|---|---|
| Hospice | $ 608.885 | $625,313 | 6,062 | 6,061 | $100 | $104 |

This is greater than the $25 to $70 X-ray price Defendants extend to many SNFs and ALFs, as set forth in paragraphs 97-104 above.

117.     "Hospice" makes for a fair comparison with SNFs because they are similar in terms of how many patients receive an imaging service each time a MobilexUSA technician visits the facility sites, which affects the cost of each imaging service.

118.     For X-rays, since the transportation of the portable X-ray equipment to the site is the greatest component (80%) of the cost of an X-ray, the greater the number of patients X-rayed per trip, the lower will be the average X-ray cost per patient. *See* TridentUSA Management Presentation dated June 2011, slide 25. This requires grouping of patients for X-rays, which is not always possible because facilities can request an immediate X-ray of a patient, known as a "stat" order if required in two hours and an "ASAP" order if required in four hours.  In general, the higher the acuity or sickness of the patients on average, the greater will be the number of high priority orders and the lower will be the number of patients seen per trip, resulting in a higher cost per X-ray.

---

[24] https://www.medicare.gov/coverage/hospice-and-respite-care.html   An exception is when a patient must be X-rayed for a diagnosis that is unrelated to the disease for which the patient was admitted under hospice care. In such rare instances, the X-ray provider charges Medicare Part B instead of billing the hospice facility under Part A

119.     For Defendants' clients, SNFs and Hospices have a similar number of patients that
are X-rayed on each trip that a MobilexUSA technician makes to the site:

| Facility Type | Number of Patients Per Trip |
|---|---|
| SNF | 1.28 |
| Hospice (December 2011) | 1.04 |

120.     Thus, one would expect the price that Defendants charged per X-ray to be similar
between SNFs and Hospices.  However, such was not the case.  Compare the average $102 price
per X-ray patient encounter that Defendants charged Hospices with the $25 to $70 price
Defendants charged many SNFs and ALFs. (*See* ¶¶ 97-104 above).

> **2.     Defendants Charge Facilities that are Entirely Responsible for All Mobile Imaging Costs ("FACs"), Which Have No Part B Business to Refer, More than SNFs, Which Do.**

121.     Defendants use the term "FAC" to describe facilities, which are not SNFs and
which have no referable Part B business, that are billed 100% of the cost of the mobile imaging
services by Defendants and then pay Defendants directly for those services, such as psychiatric
facilities. Examples of Defendants' FAC clients include:

47

| Facility Type "FAC" Name | State |
|---|---|
| NEW COURTLAND LIFE PROGRAM GERMANTOWN HOUSE | PA |
| FRIENDS HOSPITAL | PA |
| NORRISTOWN STATE - BLDG#1 | PA |
| ALLIED REHAB SERVICES | PA |
| CLARKS SUMMIT STATE HOSPITAL | PA |
| GEISINGER HEALTH SOUTH REHAB | PA |
| JOHN HEINZ REHAB CENTER | PA |
| MARWORTH WAVERLY | PA |
| ALLIED REHAB SERVICES AT MOSES TAYLOR HOSPITAL | PA |
| NORRISTOWN STATE - BLDG#9 | PA |
| NORRISTOWN STATE - BLDG#10 | PA |
| NORRISTOWN STATE - BLDG#51 | PA |
| SOUTH HAMPTON COMMUNITY HOSPITAL | TX |
| SENTARA SENIOR COMMUNITY CARE (PACE) VB | VA |
| SENTARA SENIOR COMMUNITY CARE(PACE) PORTSMOUTH | VA |
| NEW COURTLAND ADC | PA |
| HEALTH TRAC | NY |
| CONTINUUM HEALTH SERVICES, LLC | TX |
| MOUNT CARMEL OCCUPATIONAL HEALTH WEST | OH |
| DANVILLE STATE HOSPITAL | PA |

122.    FACs pay Defendants one price per imaging service, which is approximately $90

for an X-ray.

| Facility Type | 2010 Revenue* | 2011 Revenue | 2010 Patient Count | 2011 Patient Count | Average Price Charged in 2010 | Average Price Charged in 2011** |
|---|---|---|---|---|---|---|
| FAC | $588,410 | $371,487 | 6,195 | 3,690 | $95 | $101 |
| | | | | | less $9 professional component[25] | |
| | | | | | $86 | $92 |

---

[25] The physician's professional fee component (such as a radiologists' charge for interpreting X-rays) is excluded from Medicare Part A. Therefore, mobile X-ray suppliers such as Trident don't charge facilities for the physician's professional fee under Medicare Part A. Instead, they bill the physician's professional fee component directly to Medicare based on the Medicare Fee Schedule. Thus, SNFs and hospices covered under Part A pay for all X-ray charges except physician's charges. Where the facility is paying for X-rays itself which are not covered under Medicare Part A or Part B, it also pays for the physician's professional fee itself. Therefore, in order to compare apples to apples, the average physician charge of $9 for the interpretation of an X-ray must be subtracted from the price Defendants charge FACs.  Doing so allows us to compare Defendants' X-ray charges exclusive of the physician's professional fee given to FACs, SNFs and Hospices.

This is far greater than the $25 to $70 price given to many SNFs and ALFs, as set forth in paragraphs 90-97 above.

123.    FACs make for a fair comparison with SNFs because the two types of facilities are similar in terms of how many patients receive an imaging service each time a MobilexUSA technician visits the facility site, which affects the cost of each imaging service.

124.    For Defendants' clients, SNFs and FACs have a similar number of patients that are X-rayed on each trip that a MobilexUSA technician makes to a facility site:

| Facility Type | Number of Patients Per Trip |
|---|---|
| SNF | 1.28 |
| FAC | 1.42 |
| (December 2011) | |

125.    Thus, because the transportation costs are the vast majority (80%) of the cost in delivering an X-ray, one would expect the price per X-ray to be similar. However, such was not the case.  Certain SNFs, because of their ability to refer Government Payor business paid by the government, were given greatly reduced pricing on the cost of the X-rays that they paid themselves (the Part A business) as compared to the pricing given to FACs which could not refer business to be paid by a third party such as the government.  Compare the $90 price per X-ray patient encounter that Defendants charged FACs with the $25 to $70 price Defendants charges many SNFs and ALFs. (*See* ¶¶ 97-104 above).

E.    <u>**Defendants Knowingly Provided Steep, Commercially Unreasonable and or Below Cost Discounts on Medicare Part A Business to SNFs**</u>

1.    <u>**Trident Operated in a Highly Competetive Industry that Forced it to Match or Beat Competitors' Low Part A Pricing to SNFs**</u>

126.    Defendants operated in a highly competitive environment and employed these swapping tactics to gain an edge in the marketplace to attract new clients and to retain their existing clients.  Defendants used commercially unreasonable and/or below Cost business as loss leaders

to obtain new business and to retain their existing client base in a competitive market. By doing so, they profited because the higher priced and profitable Government Payor business made up for the low priced Part A business. Defendants would not agree to the unprofitable Part A business without the SNF agreeing to refer its lucrative and profitable Government Payor business that was paid for by the government which more than offset Defendants' Part A losses. The agreements for SNF clients to refer all of their business were either explicit or implicit because generally SNFs used only one provider to furnish mobile X-ray services. Indeed, as shown below, Defendants monitored and worked to at least match the mobile X-ray pricing that competitors gave to SNFs so that Trident could secure those SNFs as clients for itself.  It was well understood by Trident management and sales personnel that nursing homes used a "single source" for mobile X-rays and that once it secured a SNF as a client, it would receive all of that SNF's mobile imaging business, including Part A and the more lucrative Part B and Medicaid business.

127.    The highly competitive nature of the mobile imaging industry put great pressure on Defendants to charge SNFs as little as possible for the Part A mobile imaging services that the SNFs would pay for directly.

128.    This competition is illustrated in the following MobilexUSA chart in its Southwest Region Quarterly Business Review dated April 7, 2011 that lists its "At Risk Accounts":

# At Risk Accounts

| AREA | FACILITY | TYPE | BEDS | CORPORATE | REASON CODES | ACTION | STATUS |
|---|---|---|---|---|---|---|---|
| Houston | Tomball HC | SNF | 126 | SWLTC | E | Competitor offering lower pricing.  Have not cancelled but using Mobilex as Back up | at risk |
| Houston | Gulf HC Port Arthur | SNF | 150 | SWLTC | E | Competitor offering lower pricing. | at risk |
| Houston | Gulf HC Texas City | SNF | 150 | SWLTC | E | Competitor offering lower pricing. | at risk |
| Houston | Gulf HC Galveston | SNF | 150 | SWLTC | E | Competitor offering lower pricing. | at risk |
| Houston | Heartland at Royal Oaks | SNF | 180 | Manor Care | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Grace Care of Katy | SNF | 79 | Independent | D | Tech issues, scheduling issues with epilences | at risk |
| Houston | Oakmont of Humble | SNF | 134 | Diversicare | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Humble HC | SNF | 111 | Nexion | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Magnolia Manor | SNF | 138 | Cantex | O | Corp decision to change to vendor all other facilities are using | at risk |
| Houston | Manor Care Webster | SNF | 102 | Manor Care | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Manor Care Sharpview | SNF | 130 | Manor Care | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Heartland at Willowbrook | SNF | 186 | Manor Care | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Green Acres Huntsville | SNF | 88 | Nexion | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Allenbrook | SNF | 120 | Nexion | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Green Acres Baytown | SNF | 88 | Nexion | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Houston | Beechnut Manor | SNF | 146 | Nexion | M | Competitor offering additional services - Xray Express Offers these services | at risk |
| Arkansas | St. Andrews Place | SNF | 104 | Victoria Healthc | F | Other corporate facilities use Advanced Portable Imaging | at risk |
| Arkansas | Premier Health & Rehab | SNF | 120 | Senior Vantage | F | In process-corporate accounts director engaged | at risk |
| St. Louis | Helia (Heritage Park) | SNF | 70 | Independent | E | recent updates pending | at risk |
| St. Louis | Frene Valley | SNF | 96 | Independent | E | recent updates pending | at risk |
| St. Louis | Granite Nursing and Rehab | SNF | 86 | Tara Health | E | Looking at corp pricing options, we service 3 of 7 | at risk |
| Arkansas | Conway Healthcare-Rehab | SNF | 104 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| Arkansas | Des Arc Nursing-Health | SNF | 105 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| Arkansas | Garland Nursing-Rehab | SNF | 98 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| Arkansas | Sheridan Nursing-Health | SNF | 105 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| Arkansas | The Pines Nursing -Rehab | SNF | 121 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| Arkansas | Arbor Oaks Healthcare-Rehab | SNF | 70 | Diversicare | F | MobileXUSA National Account Team engaged with corporate process | Commited |
| St. Louis | Gasconade Manor | SNF | 114 | Independent | E | recent updates pending | Commited |
| St. Louis | Presby Manor of Rolla | SNF | 67 | Independent | O | recent updates pending | Commited |
| St. Louis | Stearns Nursing and Rehab | SNF | 122 | Tara Health | E | Looking at corp pricing options, we service 3 of 7 | Commited |
| St. Louis | Scenic Nursing and Rehab | SNF | 189 | Tara Health | E | Looking at corp pricing options, we service 3 of 7 | Commited |
| St. Louis | Gardenview O'Fallon | SNF | 120 | Smith Bros | C | Radiologist Readings - numerous misreads | Commited |

Legend:
A - Not being able to offer Ultrasound
B - Competition has CR Vans
C - Mis-reads
D - Technologist Service issues
E - Pricing

F - Relationship with Other Vendors
G - Film Quality
H - New Facility Administrator
I - Turn Around Times
J - Lack of internal support - DON

K - Film Delivery
L - Facility Closing - (due to Medicare/Medicaid certification)
M - Competition offering Full Range of Services(ie, PICC line, IV's, Abulance Service, Tube Placements)
O - Other



129.    Under "Action" in the chart above, the comment "Looking at corp pricing options" means that Robin Martial, Trident Executive Vice President, whose National Account Team negotiated below cost pricing with SNF chains, would be responsible for devising more attractive (lower) pricing for the SNF, which MobileX was at risk of losing. Robin Martial directly reports to Mark Parrish, Trident's CEO. Based on Relator's experience at the Company, including his attending Operations Review Meetings of the Operations Committee of the Board of Directors, Senior Leadership Meetings and Quarterly Business Review (QBR) Meetings, "corp" in the comment above refers to the corporate level, which is above the regional leve1, and "pricing options" means ways of meeting nursing homes' expectations for X-ray pricing, which were extremely low.

130.    Under "Action" in the chart above, the comment "MobilexUSA National Account Team engaged with corporate process" for Diversicare means that the local sales staff, which does not have the authority to sell or negotiate pricing below cost, has escalated the issue to the National Account Team, led by Robin Martial, to negotiate more attractive pricing directly with the executive of the SNF in an effort to retain the SNF as a client of Defendants. Relator knows the meaning of this comment because he was directly engaged in this "corporate process" by creating reports related to SNF business metrics for Robin Martial and other members of the National Account team, including SNF chain revenue reports, Customer portal usage reports and EMR implementation reports.

131.    The intense price competition between mobile imaging competitors is shown in the Sales Growth Strategy Plan in MobilexUSA's June 28, 2012 Quarterly Business Review ("QBR") of the Mid-Atlantic Region.  For the Maple Woods SNF, "MobilexUSA pricing is matched by MXI."[26]  Church of the Brethren "… need[s] to be at the same pricing." Brookline Manor, part of Guardian SNF chain, is already receiving low Part A pricing from a competitor: "Low Part A, Guardian."  Thus, Defendants had every incentive to cut prices anywhere they could to gain business.

---

[26]MXI is Mobile X-ray Imaging Company, a competitor of Defendants.

4 Case 2:16-cv-02956-BMS   Document 10   Filed 05/07/18   Page 57 of 107

## Sales Growth Strategy

**Mid Atlantic Region- Western PA Sales Growth Strategy**

| Marketing Type: A1 Skilled Facilities TARGET: 11-13 New Accounts | Total SNFs 240  MXUSA 82  Opportunites 158 |
|---|---|
| **X-Ray Growth Strategy** | **Steps/Tools** |
| DR Throughout Western PA Target Physician's Mobile XRAY Accts | Employ DR/Ultrasound Service Advantage versus MXI Market Share List |
| Altoona/Johnstown Area SW Veterans Home Clarion Phych Center | Target every prospect Finalize deal. |
| Kindred - LTAC Arbutus | Finalize deal. |
| Presbyterian Greater Johnstown | Contract signing in place |
| Maple Winds | Owners reviewing contract, MXI matched pricing.- Erin M has relationship, friends w Rick Wilson at Arbutus |
| Church of the Brethren | Edie- stopping by 05/17 to get invoices, there is a CEO above her, will review contract, need to be at same pricing |
| Brookline Manor | Note- low Part A , Guardian |

132.    In the same Quarterly Business Review, the following comment next to "The Greenery," part of the Fundamental SNF chain, appears: "25 cents per diem, non-compliant, Robbin work Corp level..." This means that a competitor is giving The Greenery a per diem contract rate for X-rays of 25 cents per diem, which is a price that the sales team cannot match itself because it would cause them to be blatantly "non-compliant" with the Anti-kickback Statute. Thus, the National Accounts Team with Robbin Reichert, who reported to Robin Martial, Executive Vice President of Sales & Marketing, would need to be engaged to figure out how to match such low pricing since it had the authority to do so.

| | Cam Magavitt- over homes in WI and PA- 3- WI, 1-PA- 25 cents per diem, non compliant, Robbin work Corp level, likely reason they won't provide invoices - |
|---|---|
| The Greenery | compliance- Fundamental |

133.    In the "Mid Atlantic Region- Eastern PA Sales Growth Strategy" for 2011, the status of the contract with the New Eastwood SNF is "Aug 1 start? Delay now w OH lawsuit." This means that the below cost pricing should not be implemented until a lawsuit under the False Claims Act against MobilexUSA in Ohio is resolved. Thus, Defendants knew the inherent illegal nature of below cost pricing and swapping and were awaiting resolution of the FCA case against them before resuming their illegal activity.

53

| X-Ray Growth Strategy | Steps/Tools | Champion Responsible | Due Date | Status |
|---|---|---|---|---|
| Kindred Wyomissing | From March 5 email target list | Jeff B/Jim P | 5/1/2012 | June 1 start- 100% |
| New Eastwood | Signature Home | Robbin R- Jim P | 6/1/2012 | Aug 1 start?  Delay now w OH lawsuit |
| | | | | |
| HQM of Laurelwood | Signature Home | Robbin R/Jennifer | 7/1/2012 | Aug 1 start?  Delay- Ohio lawsuit |
| HQM of Cheapeake Shores | Signature Home | Robbin R/Jennifer | 7/1/2012 | Aug 1 start?  Delay- Ohio lawsuit |

134.    Providing below Cost prices was a successful strategy for Defendants to obtain SNFs as clients. The MobilexUSA Southwest Region Quarterly Business Review dated April 7, 2011 shows that Defendants secured 25 new SNFs owned by Daybreak Ventures as clients, more than doubling its existing business with Daybreak.   And as shown in paragraph 109 above, Defendants gave Daybreak below cost pricing on its Part A business.

| Year | SNF Chain | Revenue | | Estimated Patients X-rayed | Estimated X-ray Price Per Patient |
|---|---|---|---|---|---|
| 2010 | DAYBREAK VENTURES | $ | 51,124 | 1,017 | From $25 to $74 with average of $50 |
| 2011 | DAYBREAK VENTURES | $ | 67,226 | 1,191 | From $25 to $74 with average of $56 |

The estimated X-ray prices per patient given to Daybreak Ventures SNFs were "from $25 to $74 with average of $50 in 2010 and "from $25 to $74 with average of $56 in 2011, when MobileX USA's variable costs to deliver the mobile X-rays totaled $73.

# Daybreak Update

| Territory | Existing | New | Pending |
|---|---|---|---|
| Dallas | | 4 | 8 |
| Fort Worth | 1 | 6 | 8 |
| Tyler | | 1 | 4 |
| San Antonio | | 2 | |
| Houston | 6 | 6 | 1 |
| Amarillo | 1 | | |
| Odessa | 4 | | |
| Wichita Falls | | 1 | |
| Waco | | | 2 |
| Austin | | 3 | 1 |
| Corpus Christi | | 2 | 5 |
| (10) Out of Area | | | |
| TOTAL | 12 | 25 | 29 |

9



135.   In the March 15, 2011 Midwest Region QBR, a Trident analyst wrote "Revenue per case under pressure from recent renewals & discounts," indicating that a $.30 reduction in revenue per imaging case (X-ray and Ultrasound) from January 2011 to January 2012 was the result of contract renewals that included greater discounts.

55

# Midwest FY12 YTD Results

| Mobilex Midwest | Jan 2012 Actual | % of Rev | Jan 2012 Budget | % of Rev | Jan 2011. | % of Rev | Jan 2012 Variance to Budget B(W) | % | Jan to |
|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | 2,515,593 | | 2,606,050 | | 2,351,176 | | (90,457) | -3.5% | |
| less contractual allowances | 87,982 | | 91,169 | | 89,298 | | 3,187 | 3.5% | |
| Net Revenue | 2,427,611 | | 2,514,881 | | 2,261,878 | | (87,270) | -3.5% | |
| Patient Count | 20,954 | | 21,658 | | 19,817 | | (704) | -3.3% | |
| Prior year rate adjustment | | | | | 1.71 | | | | |
| $/Case | 120.05 | | 120.33 | | 120.35 | | (0.27) | | |
| Days | | | | | | | | | |
| Direct Costs | | | Revenue per case under pressure from recent renewals & discounts. | | | | | | |

136.    The following chart, which appeared in MobilexUSA's MidAtlantic Region Quarterly Business Review dated June 28, 2012, shows that competition among portable X-ray suppliers for SNF business is largely driven by low Part A pricing in the marketplace, which pricing is below Defendants' variable costs.

# Competitive Pressure Summary

| Competitor | State (s) | X-RAY | | | | Ultrasound | | | | | Intangibles/Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Modality Film, CR, DR | Part A Discount % | Part A Flat Rate | | Part A PD Rate | Part A Discount | Transport Fee | EMR Capable | Other Services | |
| MXI/Alpha | PA, MD, DE | CR/DR (PA) CR/Film (VA) | 30% | (offers $90) | | 0.40 | 30% | No | Not yet | Lab, Bone Density | Strong Relationships/Double Shift Ultrasound/7 day/wk Ultrasound in areas, 100% CR. DR June 2012 |
| DMI | VA, MD (Possibly going into NC) | CR, DR | 37% | $55 | | n/a | $200 per | Unknown | No | | $25 After Hours charge. Flat Rate Model varies by Local Area, Heavy Marketing, Relationships |
| RPI | VA, MD | CR | n/a | n/a | | 0.40 | ? | No | No | | Sits on Board of HFAM. High Level ($10K Sponsorships-All Associations; Name PROMINENT Everywhere |
| Medfax | NY, NJ | CR, DR | 40% | ? | | 0.45 | 30% + | No | ? | Lab | .45 PPD includes xray & ultrasound |
| Health Trac | NY, NJ | CR | 35-40% | ? | | ? | 30% | No | ? | | |
| MDS | NJ | DR, CR | 30% | $60 | | ? | 30% | No | ? | | |
| Patient Care | PA, NJ, NY | CR | 30-35% | $35 -$65 | | ? | 30% | No | Yes | | Many facilities do not receive bills. |
| DMI (Worsley) | Erie, NY | CR, DR | 20% | have not heard | | n/a | 20% | No | ? | | Online viewing |
| Physicians Mobile | North PIT, New Castle, between PIT and Erie | CR | 30% | n/a | | n/a | 30% | No | No | | |
| Express | C PA, WPA, Kentucky | CR, DR | n/a | n/a | | 0.40 | PPD | No | ? | | Low pricing, Only do per diem, advertise fast turnaround times, |
| Fast Rads | PA, NJ , NY | CR | 30% | ? | | ? | ? | ? | ? | | |



35

137.    In the above chart, the Comment column for RPI states "$10K Sponsorships – All Associations; Name Prominent Everywhere".  Trident felt competitive pressure to pay for similar sponsorships and as a result, for example, made a cash payment of $5,000 on December 9, 2011 as a bronze sponsor of a healthcare conference in St. Petersburg, Florida organized by Airamid Health Management, which consults on providing management support to SNFs and ALFs. Airamid, as a SNF management company, is responsible for all SNF operational decisions, including vendor selection. As MobilexUSA's Northeast Region Quarterly Business Review, Radiology/Ultrasound/Cardiac, dated June 20, 2012 shows, Mobilex was targeting Airamid as a

2012 opportunity to add 8 SNFs for X-ray business and 40 SNFs for lab business.  Thus, this $5000

payment to Airamid was a kickback since it was a payment to induce referrals.

## National Accounts Initiatives

### Opportunities 2012

Airamid ⟶ FL xray opportunity 8 SNFs/lab opportunity 40 SN

Consulate ⟶ 32 new lab SNFs (being rolled out)

Covenant Care ⟶ Opportunity 26 new SNFs CA/IL

Extendicare ⟶ Approx 150 able SNFs in process

Five Star ⟶ Approx 30 SNFs in process

Grace Healthcare ⟶ 27 new SNFs (19 TN, 3 NC, 2 VA, 1 AZ, 1FL, 1GA)

Kindred ⟶ 16 SNFs KY

Signature ⟶ 55 new SNFs FL/KY/TN

Sun Healthcare ⟶ 9 lab SNFs in FL



41

138.    In Trident's Northeast Region Quarterly Business Review, dated March 16, 2012,

that Relator received on March 29, 2012 from administrative assistant Tonya Purvis, an analysis

of the competition concluded that two competitors - MMDS and Medx - give "below market

pricing."

58

# Competition

## Massachusetts

**MMDS - Target area: Boston-Metro West**
- Below market pricing
- Capable of offering a more efficient service model (local radiology & TAT)
- Services:  CR X-ray, Ultrasound, Bone Dens
- Ultrasounds final result within 4 hours

**Medx International - Target area Southeast MA/Northern RI**
- Below market pricing
- CR/DR technology
- Services: X-ray, Ultrasound
- NO SNF clients at this time



**St. Ann's (Steward Healthcare) -  Target area Southeast MA**
- Currently developing an outreach lab and radiology model.
- ACO attraction

**Baystate Radiology Imaging - Target area Western MA**
- Physician Network Connectivity
- Unwilling to expand geographic service area

139.    Trident's response to these competitive pressures was to obtain competitors'
invoices for Part A services directly from the SNFs and then to match the prices indicated on those
invoices. If the Part A prices were too low for the sales team to match at the single SNF level, then
the sales team would escalate the issue to the corporate level, where the corporate team had more
leeway for matching low prices across the SNF chain. The following entry in the MidAtlantic
Region Sales Plan (last updated June 27, 2012) shows that Defendants had received the invoices
sent by a competitor to Brookline Manor, part of the Guardian SNF chain, and were in the process
of comparing the invoiced pricing to its own.

| X-Ray Growth Strategy | Steps/Tools | Champion Responsible | Due Date | Status |
|---|---|---|---|---|
| Brookline Manor | Note- low Part A., Guardian | Claudia/Dave | 5/3/2012 | Received invoices, comparison in progress |

140.    The following comment in the same MidAtlantic Region Sales Plan shows that Defendants' sales staff was waiting to see the invoices sent by competitor MXI to Church of the Brethren before the Mobilex sales staff submitted their own pricing to that SNF.

| Sales Rep | Facility | CITY | STATE | Expected Close Date | COMPETITION | Next Steps/Updates |
|---|---|---|---|---|---|---|
| Claudia Shaw-Anderson | Church of the Brethren | Windber | PA | 7/1/2012 | MXI | CCRC, waiting on invoices to submit pricing. Follow up May 1 |

141.    The following comment in the same MidAtlantic Region Sales Plan shows that Defendants sought, but The Greenery, part of Fundamental SNF chain, would not provide, invoices from a competitor for Part A services, most likely because the pricing is "non compliant," which means not compliant with the AKS and likely operated as a kickback for Part B business.

| X-Ray Growth Strategy | Steps/Tools | Champion Responsible | Due Date |
|---|---|---|---|
| The Greenery | Cam Magavitt- over homes in WI and PA- 3- WI, 1-PA- 25 cents per diem, non compliant, Robbin work Corp level, likely reason they won't provide invoices -compliance- Fundamental | Crystal/Robbin | 6/1/2012 |

142.    After a competitor's invoice to a SNF was sought and obtained by Trident showing the competitor's pricing, Trident was very clear, as the same MidAtlantic Region Sales Plan shows, that its business strategy was to match the competition's pricing ("need to be at same pricing") in order to capture the SNF as a client:

| X-Ray Growth Strategy | Steps/Tools | Champion Responsible | Due Date |
|---|---|---|---|
| Church of the Brethren | Edie- stopping by 05/17 to get invoices, there is a CEO above her, will review contract, need to be at same pricing | Claudia/Crystal | 5/15/2012 |

60

143.    In addition, given the more than 20 years of statutory and regulatory guidance with respecting to such illegal "swapping" arrangements, the Defendants – experienced health care providers with detailed knowledge of the laws applicable to government programs – knew that the claims were tainted by the kickback scheme, and thus were not reimbursable by government programs such as Medicaid or Medicare Part B.

### 2.    Trident's Financial Reporting was Designed to Hide its Low Part A Pricing, and thus the Swapping Scheme, From Everyone Except Its 6 Top Executives

144.    Trident held three separate meetings in which it assessed its current performance and planned for its future business operations - Quarterly Business Review (QBR) Meetings, Operations Review Meetings and Senior Leadership Budget Meetings. These meetings were attended by the top tier Trident executives as well as other employees. At these meetings, Trident analyzed various company performance financial metrics that were presented in cost analysis reports, regional level financial reporting, break-even analyses, financial results and budgets, financial results for MobilexUSA's acquisitions, and patient count projection reports. **In all of these reports, Trident never presented the variable costs for the X-ray business and never broke out Part A from Part B in any of the figures, including for revenues, costs or numbers of patients. This allowed the 6 top Trident executives to keep its X-ray variable costs and its Part A pricing a secret, so that no other employees would know or could prove the swapping scheme.  However, as detailed below, these executives themselves were privy to Trident's X-ray variable costs and its Part A pricing such that they were fully aware that the Part A business was a loss leader for the more lucrative Part B and Medicaid business.**

### a.    X-ray Variable Costs and Separate Part A Financial Metrics Were Specifically Not Reported at Quarterly Business Reviews

145.    Trident held Quarterly Business Review (QBR) Meetings every quarter for each of is regions to assess regional profitability.  Relator attended these QBRs during his tenure at the Company, along with CEO Mark Parrish, CFO John Lanier, President of Trident East Bill Glynn, President of Trident West Kelly McCollum and other senior executives. The following is a list of dates, locations and attendees (where known) at QBR Meetings held during Relator's Trident employment:

| Date of Meeting | Region | Location of Meeting | Attended by |
|---|---|---|---|
| 8-Mar-11 | Northeast | Lakeville, MA | David Pohl; Lynn Meadows; Robin Martial; Mindy DeMedeiros; Patricia Tortorella; Jan Brill; Mark Parrish; Brian Cuomo; John Lanier; Joel Kirchick; Jeff Barton; Bill Glynn; Relator |
| 9-Mar-11 | Mid-atlantic | Horsham, PA | David Pohl; Glenn Senese; Lynn Meadows; Robin Martial; Mark Parrish; Brian Cuomo; Pat Pawling; John Lanier; Bill Glynn; Dave Williams; Mary Jo Brennan; Relator |
| 9-Mar-11 | Midwest | Horsham, PA | David Pohl; Lynn Meadows; Robin Martial; Mark Parrish; Brian Cuomo; John Lanier; Bill Glynn; Relator |
| 10-Mar-11 | Southeast | Clearwater, FL | David Pohl; David Velez; Steven Ihrke; Lynn Meadows; Robin Martial; Jeff Hooper; Mark Parrish; Brian Cuomo; John Lanier; John Karlen; Bill Glynn; Mary Jo Brennan; Relator |
| 7-Apr-11 | Southwest | Dallas, TX | Frank Gerome; Robin Martial; Joseph Kelly; Kelly McCullum; Cindy Solomon; Mark Parrish; Brian Cuomo; Gene Gunn; John Lanier; Kathryn Winward; Mary Jo Brennan; Darrell Stephens; Mary Jo Brennan; Kathy McFarland; Bill Glynn; Lynn Meadows; Relator |
| 13-Sep-11 | Southeast | Dania Beach, FL | David Velez and same as above |
| 14-Sep-11 | Northeast | Lakeville or Brockton, MA | |
| 14-Sep-11 | Mid-atlantic | Conference call | |
| 15-Sep-11 | Midwest | Southfield, MI | |
| 16-Sep-11 | Upper Midwest | Southfield, MI | |
| 27-Sep-11 | Southwest | Burbank, CA | Kelly McCullum; John Lanier; Lynn Meadows; Tom Calhoun; Julie Ravin; Carlos Ruiz; Rick Navarro; Brian Borrego; Frank Gerome; Robin Martial; Matt Mantelli; Mary Jo Brennan; Carol Quitmeyer; Kim Gunter; Kathy McFarland; Mark Parrish; Relator |
| 28-Sep-11 | Western | Burbank, CA | - Same as above - |
| 28-Sep-11 | Northwest | Burbank, CA | - Same as above - |
| 14-Mar-12 | Southeast | Sparks, MD | |
| 15-Mar-12 | Upper Midwest | Conference call | |
| 16-Mar-12 | Northeast | Video conference call | |
| 28-Mar-12 | Southwest | Plano, TX | Frank Gerome; Kelly McCullum; Robin Martial; John Lanier; Kathy McFarland; Lisa Patterson; William Joeckel; Mark Parrish; Relator |
| 20-Jun-12 | Northeast | Video conference call | Mark Parrish; Mindy de Medeiros ; Jan Brill; Rachel Carey; Joel Kirchick; Patricia Tortorella; Bill Glynn; Relator |
| 20-Jun-12 | Midwest | Conference call | Lynn Meadows; David Pohl; Michael Young; Jeff Hooper; Brian Cuomo; John Lanier; Marshal Jones; Mary Jo Brennan; Bill Glynn; Mark Parrish; Relator |
| 20-Jun-12 | Upper Midwest | Conference call | Mark Parrish; Lynn Meadows; David Pohl; Michael Young; John Cooke; Brian Cuomo; John Lanier; Marshal Jones; Mary Jo Brennan; Bill Glynn; Relator |
| 28-Jun-12 | Southeast | Conference call | |
| 28-Jun-12 | Mid-atlantic | Conference call | |

146.    Cost analysis reports were reviewed at these quarterly business reviews. An example is shown below, which appeared in the Midwest Region Quarterly Business Review for the portable X-ray business segment for 2010:

| | Mobilex midwest | FY 2010 | % of Rev |
|---|---|---|---|
| 1 | | | |
| 2 | **Gross Revenue** | **23,561,913** | |
| 3 | *less contractual allowances* | 990,906 | |
| 4 | **Net revenue** | **22,571,007** | |
| 5 | *Patient Count* | 203,206 | |
| 6 | *$/Case* | 115.95 | |
| 7 | *Days* | | |
| 8 | **Direct Costs** | | |
| 9 | Salary and Wages | 8,622,696 | 38.2% |
| 10 | OT Wages | 1,340,725 | 5.9% |
| 11 | Bonus | 184,629 | 0.8% |
| 12 | Commissions | 223,819 | 1.0% |
| 13 | Total Salaries | 10,371,869 | 46.0% |
| 14 | Total Benefits | 1,664,851 | 7.4% |
| 15 | **Salary/Wages/Benefits** | **12,036,720** | **53.3%** |
| 16 | *$/Case* | 59.23 | |
| 17 | **Indirect Costs** | | |
| 18 | Physician Fees | 2,053,558 | 9.1% |
| 19 | Other Expenses | 3,805,663 | 16.9% |
| 20 | **Total Indirect Costs** | **5,859,221** | **26.0%** |
| 21 | *$/Case* | 28.83 | |
| 22 | **EBITDA** | **4,675,066** | **20.7%** |
| 23 | *$/Case* | 23.01 | |

08-Quarterly Business Review Decks; Attachment 02

147.    For this regional level financial reporting, Trident combines revenues from Part A

and Part B and divides that revenue by total number of Part A and Part B patients to calculate

average revenue or price per patient.  Trident purposefully does not track profitability of Medicare

Parts A and B separately in order to hide the swapping arrangement and the fact that Part A is a

loss leader for the more profitable Part B business. In the cost tracking report above, line #2 shows

actual **Gross Revenue** of $23.56 million in 2010. This is combined Gross Revenue from Medicare

Part A, Part B, Medicaid and commercial payors. Line #5 shows **Patient Count** as 203,206 during

2010. Again the number of patients is a combination of patients with Medicare Part A, Part B,

63

Medicaid and commercial health care coverages. Right below this, **$/Case** calculates average revenue or pricing per patient by dividing the revenue of $23.56 million by patient count of 203,206, which gives an average price per patient of **$115.95**. However, since revenues as well as patient counts are combined Parts A and B (about 80% of the total business), Medicaid and commercial payors, kickbacks given as discounts on Part A are not visible in these reports. Prices offered by Trident for Medicare Part A business are significantly below this combined revenue/patient number.

148.    Furthermore, Trident specifically does not track its variable costs, either separately for Parts A and B or combined, but instead tracks its direct costs.  Direct costs are an improper standard of comparison to determine whether Trident's mobile X-ray pricing is below the cost of providing mobile X-rays to SNFs because direct costs are costs that are paid at the regional level, and are entirely under the control of regional management. Direct costs can be fixed or variable.

149.    More specifically, in the QBR cost analysis reports, Trident's measurement of Direct Costs do not include certain variable costs, such as:

> 1. Transportation
> 2. Lab & Imaging supplies
> 3. Insurance
> 4. Variable component of the following costs:
>     a. Sales and marketing
>     b. Contractors
>     c. Legal and professional

Therefore, "Direct Costs $/Case" in the cost analysis chart above, which is calculated by dividing total direct costs ("Salaries/Wages/Benefits") by Patient Count, is not a true indicator of the total variable cost of X-ray per patient. Because several variable costs are excluded, Direct Cost per patient will always be lower than the total variable cost per patient for Trident's X-ray business. As such, reporting only the financial metric "Direct Cost per patient," which does not break out Part A and does not include all variable costs, and not reporting Variable Cost per patient,

64

specifically and intentionally hides from Trident employees the fact that Trident's Part A pricing is below its variable costs.

150.    Trident's Quarterly Business Review (QBR) Meetings also included consideration of a break-even analysis, such as the following chart that appeared in the Midwest Region Quarterly Business Review for the portable X-ray business segment for 2010:

|  | Total Region |
|---|---|
| Technician  - FTE | 128.75 |
| Actual Studies - YTD through Dec 31 | 203,216 |
| **Exam per tech / per day** | **6.62** |
| Net Revenue Per Study  (average) | $115.95 |
| **Total Revenues** | **23,561,910** |
| Fixed Cost: |  |
| Salary, Wages and Benefits, and Commissions | 12,036,722 |
| Other Fixed Cost | 3,789,115 |
|  | 15,825,837 |
| Variable Cost | 3,044,464 |
| Total Cost | 18,870,301 |
| **Contribution Margin** | **4,691,609** |
| **Contribution Margin % (YTD through Dec)** | **20%** |
| Variable cost per study | 14.98 |
| **Break-even study volume (YTD)** | **156,748** |
| **Break-even study volume/month avg** | **13,062** |

151.    This break-even analysis identifies the volume of X-rays at which the region will break even with no profit and no loss. This break-even analysis is based on identification of fixed costs and variable costs. For calculation of break-even volume, Trident's financial analysts classify salaries and wages, overtime wages, bonus and commissions as fixed costs. Variable costs are defined as physician fees, mileage/gas and auto repair/maintenance. This analysis does not provide

true variable cost per patient that could be used to price X-rays above Cost for the following reasons:

1.  The items identified as fixed costs are in effect predominantly variable costs and should be classified as such;
2.  Variable costs should not include physician fees, which are always paid by the Government Payor, irrespective of whether the patient is Part A or Part B; and
3.
    Excluding physician fees from the variable cost reported in the break-even analysis would result in a variable cost of $6 per patient for X-ray, which is *prima facie* incorrect.

On the contrary, these break-even analyses create a false impression for the regional sales staff that Trident's variable cost per X-ray per patient is $14.98 and that all prices extended above that amount are above Cost.  Such is unequivocally not the case.

152.    Thus, as shown above, it is clear that the financial reports that are included in Trident's Quarterly Business Reviews (QBRs) do not provide any prospective or retrospective indication of the price point that would be at or above the variable cost per patient for Trident X-rays. In effect, Trident's QBRs obfuscate the true variable cost per X-ray per patient so that Trident can continue its practice of pricing Medicare Part A X-ray services below variable cost as kickbacks to SNFs without the vast majority of its employees knowing.

153.    In fact, Trident does not have any cost reports that would inform its sales staff of its variable costs so that the staff could ensure that all X-ray prices extended were above or at variable cost.

154.    Furthermore, Trident's compliance department does not receive Part A variable cost information for tracking whether prices Trident gave for Part A patients were below its variable costs. As a result, Trident's compliance department, headed by Kim Gunter-Upshaw, who reports to General Counsel Thomas McCaffery, does not have any way of identifying whether below Cost pricing is being extended.

66

b.     **X-ray Variable Costs and Separate Part A Financial Metrics Were Specifically Not Reported at Operations Review Meetings**

155.     Relator attended Operations Review Meetings. These meetings were broadly attended by Operations Committee members, senior management as well as regional management, and covered all issues related to Company's internal operations, including, sales, profitability, internal operations, audits and new IT initiatives. At these meetings, financial results and budgets were presented and considered that always combined Part A and Part B revenue and Part A and Part B patient counts. No separate financial metrics for the Part A X-ray business were ever presented or considered which concealed the low Part A pricing. Because the per X-ray per patient variable costs were also concealed, the swapping scheme could not have been uncovered.

156.     The following is a list of dates, locations and attendees at Operations Review Meetings held during Relator's Trident employment:

| Date of Meeting | Location of Meeting | Attended by |
|---|---|---|
| 10-Feb-11 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, CA | Mark Parrish, Brian Morfitt; Steve Tallman; Andrew Hopkin; Alan Morrison; Adam Abramson; Scott Liff; Anthony Zingarelli; Humphrey, Brian; Alan Frazier; Romano, Nick; Kelly McCullum; Brian Cuomo; Gupta, Asheesh; Solomon, Michael; Joseph Whitters; Bill Glynn; Thomas McCaffery; John Lanier; David Pohl; Michael Young; Relator |
| 2-Mar-11 | Mobilex/Trident Conference Room, 930 Ridgebrook Rd, Sparks, MD | - Same as above - |
| 14-Apr-11 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, Ca | - Same as above - |
| 11-May-11 | Mobilex Offices - 101 Rock Rd., Horsham, PA | - Same as above - |
| 1-Jun-11 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, CA | - Same as above - |
| 3-Nov-11 | Mobilex Offices - 101 Rock Rd., Horsham, PA | - Same as above - |
| 7-Dec-11 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, CA | - Same as above - |
| 4-Jan-12 | Dial in: 800-504-8071 Code: 7330708 | Mark Parrish, Brian Morfitt; Steve Tallman; Andrew Hopkin; Alan Morrison; Adam Abramson; Sue Otis; Anthony Zingarelli; Humphrey, Brian; Alan Frazier; Romano, Nick; Kelly McCullum; Brian Cuomo; Gupta, Asheesh; Solomon, Michael; Joseph Whitters; Bill Glynn; Thomas McCaffery; John Lanier; David Pohl; Michael Young; Lynn Meadows; Relator |
| 16-Feb-12 | Mobilex Offices - 101 Rock Rd., Horsham, PA | - Same as above - |
| 5-Apr-12 | Trident Sparks Conference Room - 930 Ridgebrook Rd, Sparks, MD | - Same as above - |
| 2-May-12 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, CA | - Same as above - |
| 7-Jun-12 | DL Executive Conference Room - 2820 N. Ontario St., Burbank, CA | - Same as above - |

157.     For the November 3, 2011 Operations Review Meeting, an Operations Review Update was disseminated prior to that meeting and was presented at that meeting.  This Update,

which was a PowerPoint presentation, showed financial results for MobilexUSA's most recent acquisitions, including Visio as set forth below. These results presented number of patients, revenue per patient and cost per patient for the most recent acquisitions on a combined basis for Parts A and B. They did not present Part A and Part B financial results separately:

## TridentUSA℠
### HEALTH SERVICES

## Visio Results YTD Thru Sept

**Visio**
**Consolidated Results**
**YTD 09/30/2011**

|  | Actual | Budget | Variance |
|---|---|---|---|
| Net Revenue | 512,648 | 679,978 | (167,330) |
| | | | |
| Salaries, Wages, & Benefits | 194,524 | 248,871 | 54,347 |
| Other Operating Expenses | 96,942 | 231,809 | 134,867 |
| Provision for Bad Debt | 17,587 | 24,535 | 6,948 |
| Field Ops Rent - Buildings | - | - | - |
| Operating Expenses | 309,053 | 505,215 | 196,162 |
| | | | |
| Contribution Margin | 203,595 | 174,763 | 28,832 |
| CM % | 39.7% | 25.7% | |
| | | | |
| Patients | 4,082 | 5,958 | (1,876) |
| Revenue per Patient | 125.59 | 114.13 | 11.46 |
| Cost per Patient (EBITDA Basis) | 75.71 | 84.80 | 9.08 |

www.TridentUSAHealth.com

16

158.     Thus, no Operations Review Meeting attendees were given the data necessary to calculate the low Part A pricing or the variable costs per X-ray per patient, keeping the swapping scheme hidden from them.

**c.     <u>X-ray Variable Costs and Separate Part A Financial Metrics
Were Specifically Not Reported at Senior Leadership Meetings</u>**

159.     Relator attended Senior Leadership Meetings (also known as Budget Meetings), which were also attended by CEO Mark Parrish, President of Trident East Bill Glynn, President

of Trident West  Kelly McCollum, Executive VP Robin Martial. These meetings focused on annual planning, budgeting and strategic reviews.  At these meetings, financial results and budgets were presented and considered that always combined Part A and Part B revenue and Part A and Part B patient counts. No separate financial metrics for the part A X-ray business were ever presented or considered which concealed the low Part A pricing, the per X-ray per patient variable costs and the swapping scheme.

160.    The following is a list of dates, locations and attendees at Senior Leadership Meetings held during Relator's Trident employment:

| Date of Meeting | Location of Meeting | Attended by |
|---|---|---|
| 24-Aug-11 | Marriott DFW Airport - 8440 Freeport Pky, Irving, TX 75063 | Anthony Zingarelli; Alan Morrison; Robin Martial; Kelly McCullum; John Lanier; Bill Glynn; Thomas McCaffery; Mark Parrish; Relator |
| 13-Dec-11 | Marriott DFW Airport - 8440 Freeport Parkway · Irving, Texas 75063 USA | Brian Morfitt; Steve Tallman; Romano, Nick; Kelly McCullum; Tom Cooper; Brian Cuomo; Thomas McCaffery; John Lanier; Bill Glynn; Joe Whitters; Mark Parrish; Relator |
| 23-May-12 | Hunt Valley Marriott - 245 Shawan Road | Hunt Valley, MD 21031 | Anthony Zingarelli;Tim Boes; Alan Morrison; Robin Martial; Kelly McCullum; David Pohl; John Lanier; Bill Glynn; Thomas McCaffery; Mark Parrish |

161.    At the December 13, 2011 meeting, for example, the Trident 2012 Plan was presented. It contains the X-ray business financial budget for 2012, which combined Parts A and B in all financial metrics for the X-ray business, including:

- Average Per Patient Rate, Revenues and Expenses;

69



# Trident East X-ray Services

Exam Rate

- 2012 avg. per patient rate $128.48
  - Includes adjustments for Full Year Transportation Impact on Part A Patients
  - July 2011 enacted change in Transportation charges for Part A patients (Avg. Monthly Revenue $142K)
  - Transportation increase was layered into the periods Jan 2011 – June 2011 based on actual Part A patients seen
  - 2011 Actual Billings utilized in projected 2012 Rate Calculation
  - Rate includes 3rd Year Lift on Set-up fee increase ($400K impact)

- 2011 FCST Rate $ 126.60

Revenue

- Overall YOY Change 8.8%

|  | 2011F | 2012 FY Impact | Change | % Change |
|---|---|---|---|---|
| Core | 160,223,981 | 168,118,281 | 7,894,300 | 4.9% |
| 2011 Acquisitions | 9,721,961 | 16,728,467 | 7,006,506 | 72.1% |
| Total | 169,945,942 | 184,846,748 | 14,900,806 | 8.8% |

www.TridentUSAHealth.com

17

70



Trident East X-ray Services

## Total Division  2011 Forecast Vs 2012 Plan

|  | 2011F | % of Rev | 2012 Plan | % of Rev | Variance | % Increase / Decrease |
|---|---|---|---|---|---|---|
| Revenues | 169,945,942 |  | 184,846,748 |  | 14,900,806 | 8.8% |
| Operating Expense | 120,544,791 | 70.90% | 130,109,664 | 70.40% | (9,564,873) | -7.9% |
| EBITDA | 49,401,150 | 29.10% | 54,737,084 | 29.60% | 5,335,933 | 10.8% |

www.TridentUSAHealth.com                    18

- and Patient Counts.

71



**Trident East X-ray Services**

## Patient Count Growth Assumptions

| Core | 2011 Patient Count | 2012 P/C Budget | YOY Growth % |
|---|---|---|---|
| Mid Atlantic | 415,346 | 424,043 | 2.1% |
| NorthEast | 238,745 | 243,993 | 2.2% |
| Midwest | 218,765 | 231,421 | 5.8% |
| South East | 311,793 | 325,293 | 4.3% |
| Upper MidWest | 61,997 | 112,395 | 81.3% |
| South West | 130,106 | 141,879 | 9.0% |
| | 1,376,752 | 1,479,024 | 7.4% |

\*Mid Atlantic reflects loss of Orthodox homes in NJ (Fiegenbaum et al) impacting YOY Growth\*

www.TridentUSAHealth.com

21

162.    Thus, no Senior Leadership Meeting attendees were given the data necessary to know or to calculate the low Part A pricing or the variable costs per X-ray per patient, keeping the swapping scheme hidden from them.

163.    In addition, patient count projection reports were disseminated weekly to all Trident senior management. These reports also deliberately combined Part A and Part B patient counts.  A portion of the report for the week ending May 31, 2012 demonstrates this:

72

| | | 2012<br>May 1-6 | 2012<br>May 7-13 | 2012<br>May 14-20 | 2012<br>May 21-27 | 2012<br>May 28-31 | Total Mo.<br>to Date | Proj.<br>Mo. End | 2012<br>May<br>Budget | Variance | Prior<br>Year | Variance | Prior<br>Mo. Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MobilexUSA & ADS** | | | | | | | | | | | | | |
| | **COMPANY CONFIDENTIAL - LIMITED DISTRIBUTION** | | | | | | | | | | | | | |
| | **Weekly Patient Count Projection** | | | | | | | | | | | | | |
| | **Week Ending May 31, 2012** | | | | | | | | | | | | | |
| **Number of Workdays in Month** | | 4.50 | 5.50 | 5.50 | 5.50 | 3.25 | 24.25 | 24.25 | | | 23.50 | | 23.00 | |
| **Xray** | | | | | | | | | | | | | | |
| | **East Region** | | | | | | | | | | | | | |
| **Pennsylvania Division** | | | | | | | | | | | | | | |
| 71020 | Central Pennsylvania X-ray | 546 | 693 | 690 | 722 | 450 | 3,101 | 3,101 | 3,201 | (100) | 3,684 | (583) | 3,037 | 64 |
| 71025 | Central Pennsylvania LMX X-ray | 413 | 525 | 489 | 440 | 347 | 2,214 | 2,214 | 2,642 | (428) | 1,767 | 447 | 2,169 | 45 |
| 71640 | Northeastern Pennsylvania X-ray | 685 | 798 | 804 | 823 | 512 | 3,622 | 3,622 | 3,884 | (262) | 3,702 | (80) | 3,401 | 221 |
| 71023 | Northeastern Pennsylvania LMX X-ray | 191 | 224 | 250 | 239 | 145 | 1,049 | 1,049 | 1,108 | (59) | 1,074 | (25) | 983 | 66 |
| 71641 | Western Pennsylvania X-ray | 399 | 469 | 448 | 437 | 253 | 2,006 | 2,006 | 2,181 | (175) | 2,032 | (26) | 2,061 | (55) |
| 71024 | Western Pennsylvania LMX X-ray | 89 | 113 | 109 | 92 | 66 | 469 | 469 | 521 | (52) | 505 | (36) | 475 | (6) |
| 71026 | PA SCI Prisons LMX X-ray | 618 | 668 | 691 | 771 | 475 | 3,223 | 3,223 | 3,135 | 88 | 3,038 | 185 | 2,997 | 226 |
| 71950 | NEMX-Pennsylvania X-ray | 51 | 53 | 76 | 66 | 37 | 283 | 283 | 278 | 5 | 269 | 14 | 303 | (20) |
| | **Subtotal Pennsylvania X-ray** | 2,992 | 3,543 | 3,557 | 3,590 | 2,285 | 15,967 | 15,967 | 16,950 | (983) | 16,071 | (104) | 15,426 | 541 |

**d.** **Trident's 6 Top Executives Knew of the Company's X-ray Variable Costs and the Low Part A Pricing, and thus the Swapping Scheme**

164.    The following six top executives at Trident knew Trident's variable cost per patient encounter per X-ray, and that Trident priced its X-rays for Part A patients for certain SNFs and ALFs at below Cost, which acted as an inducement to obtain the entirety of the SNFs' business, including the lucrative Part B and Medicaid business:

- Mark Parrish, Chief Executive Officer
- John Lanier, Chief Financial Officer
- Bill Glynn, President, Trident East (MobilexUSA, Horsham, PA)
- Kelly McCullum, President, Trident West (Diagnostic Lab, Burbank, CA)
- Tom McCaffery, General Counsel
- Robin Martial, Executive Vice President of Sales

165.    **These executives were specifically presented with Trident materials that showed that MobilexUSA's total cost per patient for each X-ray was $98.53 in 2009 and $95.97 in 2010, and that variable costs were 90% of those figures. Thus, the variable costs for providing mobile X-ray services were, according to Defendants' own internal numbers and after subtracting $9 in physician fees, approximately $77 per patient. The following document shown to Trident's top executives shows this.**

73

## Mobilex Cost Detail

|  | FY09 | FY10 |
|---|---|---|
| Patient Count | 961,916 | 1,163,013 |
| Total Costs | 94,775,305 | 111,618,427 |
| **Cost per patient** | **98.53** | **95.97** |

### X-ray

| Expenses | Amount | Fixed | Variable |
|---|---|---|---|
| Salary/Wage/Benefit | 106.2 | 20% | 80% |
| Physician Fees | 16.7 | 0% | 100% |
| Transportation | 8.1 | 5% | 95% |
| Lab and Imaging Supplies | 2.0 | 50% | 50% |
| Sales and Marketing | 3.0 | 80% | 20% |
| Insurance | 2.1 | 80% | 20% |
| Repairs and Maintenance | 2.9 | 5% | 95% |
| Rent | 4.0 | 100% | 0% |
| Telecom | 4.6 | 100% | 0% |
| Legal and Other Professional Services | 1.6 | 80% | 20% |
| Contractors | 0.5 | 50% | 50% |
| General and Administrative | 5.6 | 80% | 20% |
| **Total Expenses** | **157.0** | **26.3%** | **73.7%** |
| Assumption in model |  | 10% | 90% |

166.    This information was presented in an email dated October 3, 2011, to the six executives listed above, 3 other Trident employees involved in the potential investment/acquisition, 7 employees of CitiBank, the Managing Director Defendant Adam Abramson and the Vice President of Defendant Audax Group, and the Chairman Defendant Alan Frazier and a General Partner of Defendant Frazier Healthcare Ventures. Audax and Frazier were

the two private equity groups that owned Trident.[27]  Further, those six Trident executives were aware of the cost information in that Trident Management Presentation, since they had presented it to Ares Private Equity, GTCR Private Equity, Kelso & Company, Summit Partners, THL Partners and TPG Capital in July and August of 2011 and to Court Square Capital Partners in October 2011.

167.    Thus, those six Trident executives knew that for Financial Year (FY) 2010, 90% of $95.97 was $86 per patient in variable costs per X-ray. After subtracting $9 in physician fees, they knew that the variable cost per patient per X-ray was approximately $77.

168.    These same six executives were the only Trident employees other than Relator who had access to the National and Regional Chain Pricing List, which listed the X-ray price per patient that each facility was being charged for its Part A patients. Robin Martial compiled and maintained the National and Regional Chain Pricing List and shared it at a meeting with Mark Parrish, John Lanier and Bill Glynn on October 5, 2011 to discuss sales strategy. At a Senior Management Meeting held in Dallas on August 24, 2011 attended by these top 6 executives and in a follow up email dated August 29, 2011, Mark Parrish asked Tom McCaffery to "conduct an inventory of existing pricing to determine outliers" and to update all "Pricing and Contracting Policies." As a

---

[27] The recipients of the October 3, 2011 email attaching the Management Meeting Presentation that was sent by a CitiBank analyst were:
Alan Morrison – Vice President of Mergers and Acquisitions, Trident
Michael Young – Treasurer of Trident
Alan Frazier –Chairman of Frazier Healthcare
Brian Morfitt – Partner from Frazier Healthcare
Vincent Forgione – Director of Tax Payments, Trident
Adam Abramson –Managing Director of Audax Group
Andrew Hopkin – Vice President of Audax Group
Barry Blake – CitiBank Analyst
Toby King – CitiBank Managing Director
David Blais – CitiBank Analyst
Kelechi Okereke – CitiBank Analyst
Sam Stein – CitiBank Analyst
Elliot Jenks – CitiBank Analyst
Bianca Tylek – CitiBank Analyst

result, Robin Martial gave McCaffery access to the National and Regional Chain Pricing List. McCaffery was instructed to "develop a recommended program to Mark, John, Bill and Kelly." Thus, the pricing information was also disseminated to Kelly McCullum, and the information was again confined to the top tier executives only.

169.    Thus, knowing the total variable cost per X-ray per patient and knowing the actual Part A X-ray pricing, these six executives knew that Trident was giving below Cost pricing to certain of its SNF and ALF clients for their Part A patients.

170.    These executives also knew the single source model that nursing homes used for service providers and that Trident required in its contracts with nursing homes, and they knew the overall revenues generated from Trident's X-ray business by facility chain. Thus, they knew that those facility chains being given below Cost pricing for Part A business were only profitable to Trident because of the lucrative Part B business that those chains referred to Trident.

### 3.    Trident Kept the Swapping Scheme Hidden From Potential Investors

171.    Relator, who was Trident's Chief Information Officer, was deliberately dissuaded from putting any systems in place that would calculate or lead to the calculation of separate and/or accurate financial metrics for Trident's Part A business.  When Relator was building Trident's data warehouse (a database that is used to analyze business outcomes), Relator asked CFO John Lanier (on April 27, 2011, after a meeting to discuss the build out of the data warehouse[28]) how Relator should price Medicare Part A in the data warehouse so that Trident could calculate and reconcile the revenues correctly across Part A and Part B separately. John Lanier responded that Relator should price Medicare Part A using the Medicare Part B fee schedule in the data warehouse. This

---

[28] Attendees were Relator, CFO John Lanier, Asheesh Gupta (from Audax Group, one of the two original private equity investors in Trident),  Lynn Meadows (Vice President of Billing who reported to CFO Lanier), Mike Solomon (an Analyst from Audax Group), Steve Tallman (Partner from Frazier Healthcare, the second original private equity investor in Trident) and Treasurer Michael Young (who reported to CFO Lanier).

76

did not make sense to Relator, and Relator asked Mr. Lanier why he should not input into the data warehouse Trident's actual pricing of services provided to Part A patients so that Trident's Medicare Part A revenue could be accurately calculated. Mr. Lanier became agitated, muttered something and then left. As a result, Relator followed up the next day (April 28, 2011) with an email to CEO Parrish, with a copy to CFO Lanier, stating that "we have dialed back [the] data warehouse scope…"

172.    During a Senior Management Meeting on May 23, 2012 at the Marriott Hotel in Hunt Valley, MD, Relator asked if Trident calculates Part A and Part B profitability separately. Mr. Lanier became aggravated and simply ignored Relator's question. The attendees at this Senior Management Meeting were Thomas McCaffery, John Lanier, Alan Morrison, Tim Boes, Robin Martial, Anthony Zingarelli, David Pohl, Bill Glynn and Kelly McCullum.

173.    On July 15, 2011, Kelso & Company, a private equity firm that was considering investing in or acquiring Trident, was conducting due diligence of Trident under a confidentiality agreement. Trident referred to this potential deal as Project Talisker. Kelso asked Trident, for, *inter alia*:

> "a. Pricing for Part B vs. Part A by facility (we need to
>     understand the discount on a by facility basis)
>
> b. Part A & Part B test volume and revenues by facility"

174.    Trident did not track publicly or internally in most distributed reports Part A and Part B volumes, costs, revenues and profitability separately or by facility. In its financial reports, these financial metrics for Part A and Part B were combined. Thus, Trident had to initiate a data collection effort with the assistance of Relator to respond to Kelso's request. The programmer Markell Whittlesey, who reported to Relator, then extracted Part A facilities' 18-months accounts

receivables data by facility from Trident's DDF[29] system on July 19, 2011. In addition, Mike Solomon, one of the analysts from the Audax Group (one of the private equity owners of Trident)[30], prepared a detailed customer database by facility in June of 2011. Mike Solomon sent this customer database to Relator for review. Thus, Trident only gave Kelso information on accounts receivable by facility and a customer database, and Kelso did not get an answer to its question about Part A pricing, test volume and revenues.  Kelso followed up with further questions regarding Part A pricing and costs, to no avail. Trident simply did not allow its Part A X-ray business to be tracked separate and independent from the rest of its X-ray business, including Part B, Medicaid and commercial insurance. Kelso declined to invest in Trident.

175.    On July 29, 2011, GTCR Private Equity, another potential investor in Trident, asked, pursuant to a confidentiality agreement, for "All policies and procedures addressing the determination of fair market value of Part A charges, forgiveness of A/R and any other potential discounts that were in effect during the previous three years, indicating the dates the policies were in effect and to which entity they applied."  Effectively, GTCR was asking if Trident had policies and procedures in place so that Part A pricing was not used as a kickback to SNFs. However, Trident did not have detailed policies and procedures, or cost and profitability reports separately by Part A and Part B, which would have allowed its compliance department to ensure that Part A pricing was not being used as a kickback. Trident entered GTCR's question into an internal spreadsheet that recorded and tracked the questions asked by, and responses given to, potential investors by Trident management. Trident closed this question in this spreadsheet on August 4,

---

[29] DDF system was an internal Trident computer system that was used to receive and fulfill orders for X-rays and Ultrasound. In addition, this system was used for pricing and billing of Medicare Part A charges to SNFs.

[30] Audax Group, Boston, MA, was one of the private equity owners of Trident. The other owner was Frazier Healthcare Partners, Seattle, WA.

2011 by entering the following answer into the spreadsheet: "None." GTCR declined to invest in Trident.

### 4. Trident's Owners Knew of the Swapping Scheme

176. In 2011 and until July 2013, Trident was majority owned by private equity firms Audax Group, based in Boston, MA, and Frazier Healthcare, based in Seattle, WA. Audax Group, led by Managing Director Adam Abramson, and Frazier Healthcare, led by Chairman Alan Frazier, were closely engaged in all of the management decisions and operations reviews of Trident, and were aware of the loss leader Part A pricing and the kickback scheme.

177. As set forth above, in the 2nd quarter of 2011, Audax and Frazier Healthcare initiated Project Talisker to sell Trident to other private equity investors. Audax and Frazier hired Citibank to sell the company and facilitate all due diligence by potential investors.

178. All answers to questions posed by potential investors had to be reviewed and then approved by Trident majority owners Defendants Audax and Frazier. As detailed above in ¶¶ 173-175, Trident avoided providing responses to questions about Medicare Part A and Part B pricing or the determination of the fair market value of Part A charges in order to cover up the kickback scheme. In fact, Trident management gave deceptive information to prospective buyer Kelso & Company. This false information given to Kelso, which was first approved by Audax and Frazier, was that Trident was generally giving discounts of only 10% off of Part B prices to a large number of SNFs for their Part A business, with a full discount of at most 20%. In view of this information, Kelso's follow-up question to Trident on August 4, 2011 was: "Is the Company able to quantify the potential impact of bringing rates down to a full 20% discount across all customers?"

179. Later, during the same week of August 2, 2011, when Relator met with John Lanier, Chief Financial Officer of Trident, Lanier seemed extremely worried about showing the impact of a 20% discount on Part A pricing across all SNFs since he knew that this was just not true and that

the discounts to a large number of SNFs were much bigger than the 10%-20% being communicated to Kelso and other potential investors. The false information of a 10-20% discount, which was pre-approved by Audax and Frazier, was communicated to Kelso by Trident management [CFO John Lanier and President Bill Glynn] at several meetings that were attended by Audax Group's principal, Adam Abramson, and Frazier Healthcare's principal, Alan Frazier.

180.    Thus, Trident management and Trident's majority owners, Audax and Frazier, knowingly and intentionally misrepresented the mobile X-ray Part A pricing and fair market value while they all knew the truth about the steep discounts Trident gave on Part A pricing that fueled the kickback scheme.

181.    Indeed, Trident owners Adam Abramson of Audax and Alan Frazier of Frazier Healthcare knew Trident's actual Part A pricing for mobile X-rays. At the December 1, 2010 Operations Review meeting, Bill Glynn, President of Mobilex and Kelly McCullum, President of Trident West (Diagnostic Laboratories), facilitated a "Part A Pricing Strategy Discussion", which is how the topic appeared on the agenda for that meeting. Trident's Part A prices to SNFs, including the transportation component of these Part A prices, were specifically reviewed at this meeting. Adam Abramson and Alan Frazier (and Relator) were present at this meeting and thus knew of Trident's Part A pricing.

182.    To better understand the effects of proposed changes to the transportation component discussed at that Operations Review meeting on the overall mobile X-ray Part A prices and revenues, Trident CEO Mark Parrish asked Relator to assign programmers to modify billing software to estimate the additional revenue that the proposed transportation charge changes might produce. On April 10 and May 9, 2011, Markell Whittlesey, a programmer who reported to Relator, produced Part A pricing reports estimating such potential additional revenue for March and April of 2011, as shown below:

80

| Fac | Name | Corp | CostCenter | Region | Traditional $$ | Simulated $$ | $$ change | %change |
|---|---|---|---|---|---|---|---|---|
| 17105 | CHESTERFIELD CONVALESCENT CENTER | | 71130 | SE | 477.13 | 477.13 | 0.00 | 0.0 |
| 21317 | BLOOMINGTON NURSING & REHAB CENTER | GREYSTONE HEALTHCARE MANAGEMEI | 71620 | MW | 70.50 | 70.50 | 0.00 | 0.0 |
| 1219 | WELSH HOME (THE) | | 71610 | MW | 80.73 | 80.73 | 0.00 | 0.0 |
| 53048 | HOLY CROSS HEALTH CENTER | COVENANT HEALTH SYSTEM | 71770 | NE | 41.00 | 41.00 | 0.00 | 0.0 |
| 14343 | CHENAL REHAB | LAVIE | 71670 | SW | 772.52 | 772.52 | 0.00 | 0.0 |
| 7254 | PARKSIDE NURSING & REHABILITATION CTR | | 71615 | MW | 68.88 | 68.88 | 0.00 | 0.0 |
| 26739 | WFHC - LAKE SHORE MANOR | | 71625 | MW | 390.00 | 390.00 | 0.00 | 0.0 |
| 17560 | PARTNERS OF MARION CARE AND REHAB | SUN HEALTHCARE GROUP INC. | 71613 | MW | 387.14 | 387.14 | 0.00 | 0.0 |
| 23026 | VILLAGE ON THE ISLE/LUKE HAVEN | | 71227 | SE | 81.70 | 81.70 | 0.00 | 0.0 |
| 16197 | GOLDEN LIVING CENTER - WATERTOWN | GOLDEN LIVING | 71633 | MW | 377.00 | 377.00 | 0.00 | 0.0 |
| 17513 | TALLWOODS CARE CENTER | SCHACTER | 71040 | MA | 765.70 | 765.70 | 0.00 | 0.0 |
| 25477 | AMITY FELLOWSERVE OF HONDO | | 71511 | SW | 75.00 | 75.00 | 0.00 | 0.0 |
| 14178 | BEECHNUT MANOR | NEXION HEALTH | 71512 | SW | 388.55 | 388.55 | 0.00 | 0.0 |
| 27447 | CHALET VILLAGE HEALTH AND REHAB CENTER | | 71620 | MW | 75.00 | 75.00 | 0.00 | 0.0 |
| 2110 | LEXINGTON COURT CARE | ATRIUM CENTER, LLC | 71613 | MW | 272.00 | 272.00 | 0.00 | 0.0 |
| 56207 | BERKELEY MEADOWS CARE CENTER | | 71060 | MA | 397.18 | 397.18 | 0.00 | 0.0 |
| 23065 | SHADY ACRES, INC. | | 71110 | NE | 58.80 | 58.80 | 0.00 | 0.0 |
| 18765 | CLEARWATER CENTER | AIRAMID HEALTH CARE MANAGEMENT | 71227 | SE | 826.81 | 826.81 | 0.00 | 0.0 |
| 17752 | BROOKVIEW HEALTH CARE CENTER | PEREGRINE HEALTH SERVICES, INC | 71609 | MW | 27.00 | 27.00 | 0.00 | 0.0 |
| 17716 | UNIVERSITY PLACE NURSING CENTER | | 71512 | SW | 32.78 | 32.78 | 0.00 | 0.0 |
| 1760 | MORROW MANOR | LEVERING MANAGEMENT | 71613 | MW | 40.66 | 40.66 | 0.00 | 0.0 |
| 5062 | DELAWARE COURT | LEVERING MANAGEMENT | 71612 | MW | 65.00 | 65.00 | 0.00 | 0.0 |
| 9476 | THE OAKS HEALTHCARE CENTER | JEFF YOUNG/KELLY HARDIN/GRANT RH | 71550 | SW | 392.37 | 392.37 | 0.00 | 0.0 |
| 25780 | BELLE REVE NURSING HOME | | 71025 | MA | 1,023.50 | 1,023.50 | 0.00 | 0.0 |
| 1552 | WESTPARK HEALTH CARE AND REHAB | | 71610 | MW | 43.20 | 43.20 | 0.00 | 0.0 |

The column "Traditional $$" indicates the price per Mobile X-ray patient that Trident was charging in 2011 for the SNFs indicated. Those rows highlighted in yellow show SNFs that received pricing below Trident's $77 variable cost. The Part A pricing report containing this chart was specifically shared with Adam Abramson and Alan Frazier who, therefore, knew of Trident's Part A prices.

183.     Further, with their extremely detailed data-driven approach to understanding business, deep background in business finance, daily reports from Trident management and a large number of associates and partners from Audax and Frazier engaged in the Project Talisker due diligence process, Adam Abramson and Alan Frazier were fully up-to-date on all of the key drivers of Trident's profitability, including Part A pricing.

184.     At the same time Adam Abramson and Alan Frazier were informed of Trident's Part A pricing for mobile X-rays, they were also informed of the costs to provide those X-rays.

185.     During Project Talisker, Citibank kept Trident's executive management, as well its owners Audax and Frazier, updated about the fixed and variable costs of providing mobile X-ray services.

81

186.    On October 3, 2011, as a part of Project Talisker, Vikram Gupta of Citibank emailed Trident owners Adam Abramson of Audax and Alan Frazier of Frazier Healthcare and others concerning the due diligence to be conducted by potential investor Court Square Ventures. This email attached a document titled "2010 Fixed/Variable Cost Analysis" which set forth the total X-ray cost per patient of $95.97 in 2010 and that the variable cost was 90% of the total cost. Thus, it was clear that the variable cost was 90% of $95.97 or about $86 per patient. Further, after subtracting $9 for the physician fee for interpreting X-rays, a figure that Adam Abramson and Alan Frazier also knew from their attendance at Board meetings where physician fees were discussed[31], the variable cost of providing mobile X-ray services was $77 per patient. This document was sent only to those Trident, Audax Group and Frazier Healthcare executives who had a deep understanding of business finance and fixed and variable costs, so that they could discuss and explain the cost structure of Trident's mobile X-ray service business and the implications of that cost structure on pricing and profitability with Court Square. Therefore, Defendants Adam Abramson and Alan Frazier knew the per patient variable cost per X-ray.

187.    Therefore, since Adam Abramson and Alan Frazier knew Trident's per patient variable cost and Trident's Part A pricing, they knew of Trident's loss leader pricing whereby its Part A prices were extremely low and below its variable costs in an effort to induce referrals of Part B business.

188.    In fact, Trident corporate PowerPoint presentations show that Audax and Frazier were specifically informed of Trident's below cost pricing and the legal risks that it posed.

189.    In April 2010, a presentation made by Thomas McCaffery, General Counsel of Trident, on "Legal and Risk Management 2010 Initiatives" included Health Care Compliance as

---

[31] Indeed, about 85% of Trident's mobilex X-ray images were interpreted by radiologists on contract with Rely Radiology, which was 100% owned by Trident. Trident purchased Rely Radiology in 2008 after a detailed review of its profitability.

an area of concern. Slide #10 of that presentation showed that "Below "Cost" discounting" was one of the Health Care Compliance issues to be addressed in 2010:



190.    That same presentation stated that among the next steps to address the Health Care Compliance issues, which included "Below "Cost" discounting," was to "Engage, enlist Trident, Audax, Frazier stakeholders".



191.    A follow up presentation on July 26, 2010 confirmed that, indeed, Audax and Frazier stakeholders were engaged on the issue of below cost discounting in May-June 2010.

   Next Steps

- Leadership to set priorities
  - COMPLETED APRIL 13, 2010
- Engage, enlist Trident, Audax, Frazier stakeholders
  - COMPLETED MAY-JUNE 2010
- Formulate plans and implement

PRIVILEGED AND CONFIDENTIAL
www.TridentUSAHealth.com

Adam Abramson and Alan Frazier were the most important stakeholders from Audax Group and Frazier Healthcare, respectively, and all important information passed through them.  As such, they were directly engaged on and knew about the below cost discounting issue.

192.    Potential investors declined to invest in Trident and by the end of 2011. It was clear that Project Talisker had failed.

193.    Because Defendants Adam Abramson of Audax and Alan Frazier of Frazier Healthcare knew of the below cost pricing and the kickback swapping scheme, they also knew that they were legally exposed to claims under the False Claims Act, and acted to protect their financial interests. Indeed, in June of 2011, a relator named McDonough served his amended complaint under the False Claims Act on Mobilex.  On February 27, 2012, Judge Marbley of the U.S. District Court for the Southern District of Ohio in the McDonough case denied Defendant's Motion to Dismiss.  Thus, the McDonough case became a viable threat to Trident and to its owners' financial interests.

194.    Now that Trident was directly legally exposed, and with no buyer in sight due to the failure of Project Talisker, Trident's owners began a campaign of encumbering Trident with debt in order to siphon out its cash (by declaring dividends and taking fees) to line their own

84

pockets in an effort to protect their own financial interests should Trident be responsible for a large judgment or settlement under the False Claims Act. Audax Group and Frazier Healthcare Partners obtained new first and second lien credit facilities with Credit Suisse and a syndicate of lenders in the aggregate principal amount of up to $325 million. The transaction closed during the week of April 23, 2012. Trident owners used $144 million out of this loan to give a special dividend to themselves. This significantly covered Trident owners' risk of Trident being held liable for the kickback scheme.

195.    Trident's owners further protected themselves from the financial exposure posed by the kickback scheme by cashing out their equity.  In July of 2013, Audax and Frazier Healthcare executed a complex purchase agreement with Formation Capital as the lead buyer, resulting in the creation of Trident's successor New Trident Holdcorp and the transfer of all stock and assets from Trident USA Health Services to New Trident Holdcorp.  Audax, its principal Adam Abramson, Frazier Healthcare and its principal Alan Frazier, each retain a minority ownership stake in New Trident Holdcorp. The July 2013 sale of the company was mostly funded by a loan to New Trident Holdcorp of $570 million. Out of this loan, Trident owners received $236 million in cash for their Trident ownership interest. Thus, Trident's owners pulled out a total of $380 million of cash from Trident in less than 18 months to protect themselves from financial responsibility for the kickback scheme.

## VII.    FALSE CLAIMS

196.    As noted above, the Defendants executed provider agreements with each of the state Medicaid programs to which they submitted drug reimbursement claims.  Compliance with the AKS is a precondition to payment from state Medicaid programs.

197.    The Defendants also entered into contracts with Medicare Part B sponsors; the contracts contain language obligating them to comply with all applicable federal laws, regulations,

and CMS instructions.  42 C.F.R. § 423.505(i)(4)(iv).  Compliance with the federal AKS is a precondition to payment from Medicare Part B and other federal payors.

198.     As detailed above, the Defendants entered into untold numbers of the Medicare Part A kickback arrangements with nursing homes.  These contracts violate the AKS, and no safe harbor applies.  Through these contracts, the Defendants submitted or caused to be submitted claims for reimbursement to the Medicaid programs of the Plaintiff States, and to various federal government health care programs including Medicare and TRICARE.

199.     Each of these claims was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.  Each of those certifications was false, because each claim for payment was tainted by the kickback arrangement detailed in this Complaint.

200.     Knowingly submitting or causing the submission of claims for services which are not reimbursable creates liability under the FCA and the State FCA's.[32]  Thus, each of these claims to the Government from the Defendants constituted a violation of section 3729 of the FCA, and the analogous provisions of the State FCAs.

## VIII.  DAMAGES

201.     Because of the illegal inducements, the entirety of the government-paid business generated to Defendants by those SNFs that receive below cost pricing is implicated under the False Claims Act. Defendants' government-paid business from SNFs each year includes X-rays,

---

[32] Knowingly causing the submission of claims that are ineligible for payment under a federal healthcare program constitutes a violation of the FCA.  *See U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 147, 152-153 (D.Mass. 2001); *See also U.S. ex rel. Nowak v. Medtronic, Inc.,* Case Nos. 1:08-cv-10368 and 09-cv-11625, D. Mass. (United States of America's Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false"), and *U. S. v. Medco Physicians Unlimited*, 2000 U.S. Dist. LEXIS 5843, at *27 (N.D. Ill. Mar. 15, 2000) (granting partial summary judgment for plaintiff on the issue of liability with respect to its claim that Medco submitted false claims for non-reimbursable meals and transportation costs.)

ultrasound, lab work and mobile clinical business, and totaled approximately $95.6 million in 2010.[33]

202.     Relator estimates that MobilexUSA charges 25% of its SNF mobile X-ray service customers below-variable-cost pricing for each X-ray patient encounter.

203.     Thus, 25% of Defendants' 2010 government-paid business from SNFs is the result of inducements in violation of the False Claims, or $23.9 million. Assuming this business remained flat over the past six years, a conservative estimate of single damages under the False Claims Act would be $143.4 million in single damages over the past six years.

## IX.   COUNTS

### COUNT I

#### FEDERAL FALSE CLAIMS ACT
#### 31 U.S.C. §3729(a)(1)[1986] and
#### 31 U.S.C. §3729(a)(1)(A)[2009]

204.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

205.     Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

206.     By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

---

[33] $40.3M Medicare Part A ($51.5M -$11.2M) + $53.8M Part B (70% x $76.9M) + $1.5M Medicaid

## COUNT II

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729(a)(2) [1986] and
### 31  U.S.C. §3729(a)(1)(B)[2009]

207.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

208.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2) [1986].  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid.

209.     Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

210.     By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(3)[1986] and
### 31 U.S.C. §3729(a)(1)(C)[2009]

211.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

212.     Through these acts, and further as set forth in Counts I and II, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the United States has suffered actual damages.

88

## COUNT IV

### CONNECTICUT FALSE CLAIMS ACT
### FOR PUBLIC ASSISTANCE PROGRAMS (the "Act")
### CONN. GEN. STAT. § 17b-301 et seq.

213.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

214.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act.  Such claims caused actual damages to the State.

215.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act.  Such claims caused actual damages to the State.

216.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT V

### THE DELAWARE FALSE CLAIMS AND REPORTING ACT (the "Act"),
### DEL. CODE ANN. TIT. 6, § 1201 et seq.

217.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

218.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act.  Such claims caused actual damages to the State.

219.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act.  Such claims caused actual damages to the State.

220.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VI

### THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT (the "Act"), D.C. CODE ANN. §§ 2-308.14 et seq.

221.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

222.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the District of Columbia in violation of Section 308.14(a)(1) of the Act.  Such claims caused actual damages to the State.

223.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 308.14(a)(2) of the Act.  Such claims caused actual damages to the State.

224.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VII

### THE FLORIDA FALSE CLAIMS ACT (the "Act"),
### FLA. STAT. §§ 68.082(2) et seq.

225.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

226.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

227.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

228.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VIII

### GEORGIA FALSE MEDICAID CLAIMS ACT (the "Act")
### GA. CODE ANN. §49-4-168.1 et seq.

229.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

230.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act.  Such claims caused actual damages to the State.

231.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act.  Such claims caused actual damages to the State.

91

232.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT IX

**THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT (the "Act"), 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.**

233.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

234.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act.  Such claims caused actual damages to the State.

235.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act.  Such claims caused actual damages to the State.

236.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT X

### THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT (the "Act"), INDIANA CODE 5-11-5.5-2 et seq.

237.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

238.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act.  Such claims caused actual damages to the State.

239.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5-11-5.5-2(b)(8), of the Act.  Such claims caused actual damages to the State.

240.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XI

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (the "Act") LA. REV. STAT. § 46:438.3 et seq.

241.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

242.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act.  Such claims caused actual damages to the State.

243.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B) of the Act.  Such claims caused actual damages to the State.

244.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XII

### THE MARYLAND FALSE HEALTH CLAIMS ACT (THE "ACT")
### MD.    CODE ANN., HEALTH-GEN §§2-602 et seq.

245.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

246.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-602(A)(1), of the Act.  Such claims caused actual damages to the State.

247.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-602(A)(2), of the Act.  Such claims caused actual damages to the State.

248.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIII

### THE MASSACHUSETTS FALSE CLAIMS ACT (the "Act"),
### MASS. ANN.  LAWS. CH. 12, §§ 5B et seq.

249.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

250.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act.  Such claims caused actual damages to the State.

94

251.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  5B(2), of the Act.  Such claims caused actual damages to the State.

252.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIV

**MICHIGAN MEDICAID FALSE CLAIMS ACT (the "Act"),
MCLS §§ 400.607 et seq.**

253.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

254.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act.  Such claims caused actual damages to the State.

255.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act.  Such claims caused actual damages to the State.

256.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XV

**MINNESOTA FALSE CLAIMS ACT (the "Act"),
MINN. STAT. §15C.02 et seq.**

257.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

258.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section  15C.02(a)(1), of the Act.  Such claims caused actual damages to the State.

259.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act.  Such claims caused actual damages to the State.

260.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## <u>COUNT XVI</u>

### NEW HAMPSHIRE FALSE CLAIMS ACT (the "Act")
### N.H. REV. STAT. ANN. §167:61-b et seq.

261.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

262.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 167:61-b(I)(a), of the Act.  Such claims caused actual damages to the State.

263.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 167:61-b(I)(b), of the Act.  Such claims caused actual damages to the State.

264.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>**COUNT XVII**</u>

**NEW JERSEY FALSE CLAIMS ACT (the "Act")**
**N.J. STAT. §2A:32C-3 et seq.**

265.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

266.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act.  Such claims caused actual damages to the State.

267.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false  records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act.  Such claims caused actual damages to the State.

268.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>**COUNT XVIII**</u>

**THE NEW YORK FALSE CLAIMS ACT (the "Act"),**
**NY CLS ST. FIN. § 189 et seq.**

269.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

270.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act.  Such claims caused actual damages to the State.

271.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act.  Such claims caused actual damages to the State.

97

272.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT IXX

### NORTH CAROLINA FALSE CLAIMS ACT (the "Act")
### N.C. GEN. STAT. §1-607(A) et seq.

273.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

274.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(A)(1), of the Act.  Such claims caused actual damages to the State.

275.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(A)(2), of the Act.  Such claims caused actual damages to the State.

276.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XX

### OKLAHOMA MEDICAID FALSE CLAIMS ACT (the "Act")
### OKLA. STAT. TIT. 63, §5053.1B et seq.

277.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

278.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act.  Such claims caused actual damages to the State.

279.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act.  Such claims caused actual damages to the State.

280.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

### COUNT XXI

### RHODE ISLAND FALSE CLAIMS ACT (the "Act")
### R.I. GEN. LAWS §9-1.1-3 et seq.

281.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

282.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 9-1.1-3(a)(1), of the Act.  Such claims caused actual damages to the State.

283.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 9-1.1-3(a)(2), of the Act.  Such claims caused actual damages to the State.

284.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

### COUNT XXII

### THE TENNESSEE MEDICAID FALSE CLAIMS ACT (the "Act"),
### TENN. CODE ANN. §§ 71-5-182(a) et seq.

285.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

286.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1)(A), of the Act.  Such claims caused actual damages to the State.

287.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(1)(B), of the Act.  Such claims caused actual damages to the State.

288.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIII

### TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE ANN. §36.002 ET SEQ.

289.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

290.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 36.002(1), of the Act.  Such claims caused actual damages to the State.

291.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 36.002(4), of the Act.  Such claims caused actual damages to the State.

292.    Through these acts, Defendant knowingly made a claim for a product that has been adulterated, debased, mislabeled or that is otherwise inappropriate in violation of Section 36.002(7).  Such claims caused actual damages to the State.

293.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIV

### THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT (the "Act"), VA. CODE §§ 8.01-216.3A ET SEQ.

294.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

295.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act.  Such claims caused actual damages to the State.

296.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act.  Such claims caused actual damages to the State.

297.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXV

### WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT (the "Act") WIS. STAT. §20.931(2) ET SEQ.

298.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

299.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 20.931(2)(a), of the Act.  Such claims caused actual damages to the State.

101

300.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 20.931(2)(b), of the Act.  Such claims caused actual damages to the State.

301.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## **REQUESTS FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

**DEMAND FOR JURY TRIAL**

A jury trial is demanded in this case.

Date: May 4, 2018            Respectfully submitted,

_____

Sherrie R. Savett (PA Bar No. 17646)
Russell D. Paul (PA Bar No. 71220)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
ssavett@bm.net
rpaul@bm.net